**John DUVALL, Appellant,**

v.

**SILVERS, ASHER, SHER & McLAREN, M.D.'s, Neurology, P.C., Irving Asher, Allyn Sher, and Robert Silvers, Respondents.**

**No. WD 56693.**

Missouri Court of Appeals,
Western District.

July 27, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1999.

Before CRANDALL, P.J. and KAROHL, J. and HOFF, J.

**ORDER**

John Duvall, Columbia, pro se.

Glen Ehrhardt and Susan Ford Robertson, Columbia, for Respondent.

PAUL M. SPINDEN, Judge.

John Duvall appeals the circuit court's dismissal of his petition asking that the circuit court order a professional corpora-

tion, Silver, Asher, Sher and MᶜLaren, M.D.s, Neurology, and its partners and shareholders, Irving Asher, Allyn Sher, and Robert Silvers,[1] to pay him damages for alleged antitrust violations and tortious interference with business relations. The circuit court dismissed Duvall's petition on the ground that it did not state a claim for which it could grant relief. We affirm.

■ Because we are reviewing the circuit court's dismissal of Duvall's petition, we deem the facts that Duvall pleaded properly to be true; we construe his averments liberally; and we draw any inference that is reasonable and fair from the facts pleaded. *Stiffelman v. Abrams,* 655 S.W.2d 522, 525 (Mo. banc 1983).

Duvall's petition alleged that he obtained medical services from the defendants on January 1, 1995, in Columbia. He said that, because he was "extremely disappointed with those services[, he decided that he would] never use the defendants' business again." Duvall alleged that the defendants, intending to monopolize neurology services in Columbia, contracted on April 4, 1997, with Sudhir Batchu, a neurologist in Columbia, for Batchu's employment for three-years. Duvall averred that, after entering into this contract with Batchu, the defendants "employ[ed] and/or control[led] all of the practicing Neurologists within a seventy-five (75) mile radius of Columbia, Missouri, and ha[d] the dominant market share in central Missouri." The defendants' employment contract with Batchu, Duvall averred, included a non-compete clause which said:

Employee agrees that, should his/her employment with Employer be terminated for any reason whatsoever during the twenty-four (24) month period beginning with the date of the termination of the Employee's employment, Employee will not, for himself or herself, on behalf of or for the benefit of any other person, firm, partnership or corporation perform

any medical services or engage in the practice of neurology within seventy-five (75) miles of Employer's office located at 500 Keene Street, Columbia, Missouri 65201 on Employee's account, or otherwise solicit, service, refer to handle any medical business or engage in the practice of neurology for any patient of Employer who was a patient of Employer on the date of the termination of physician's employment with Employer.

The employment relationship between the defendants and Batchu was short-lived. The defendants terminated Batchu's employment on September 26, 1997, and raised their fees a brief time later.

On November 21, 1997, the defendants sued Batchu and asked the circuit court to enforce the employment contract's non-compete clause and to enjoin Batchu from practicing neurology within 75 miles of Columbia. In the meantime, Duvall alleged, he contracted on January 1, 1998, with Batchu for "medical goods, services, treatment and the brokerage of appropriate medications from ... Batchu on a continuing basis."

In response to the defendants' lawsuit against Batchu, the circuit court entered a preliminary injunction on April 8, 1998, enjoining Batchu from providing medical services within 75 miles of the defendants' office. After the circuit court issued its preliminary injunction, Duvall sought Batchu's medical treatment on April 10, 1998, in Columbia. Batchu refused to treat him.

Duvall averred that Batchu opened a medical office in Rolla which is more than 75 miles from the defendants' office. Duvall began traveling to Rolla to obtain Batchu's services. Batchu, according to Duvall's petition, raised his fee after opening his office in Rolla.

Duvall's petition contended that the non-compete clause in Batchu's employment contract with the defendants and the preliminary injunction issued by the circuit court were illegal because they created a

1. We refer to the respondents collectively as defendants.

restraint of trade in violation of § 416.031, RSMo 1994. He alleged these damages:

Plaintiff did and/or will loose [sic] approximately $500,000.00 in non-taxable future income caused by Plaintiff's inability to utilize Dr. Batchu in his Social Security Disability proceedings and his MOSERS Long Term Disability proceedings. Defendants caused the Plaintiff to be denied Social Security benefits of approximately $500.00 per month and MOSERS Long Term Disability benefits of approximately $1,300.00 per month. In addition, defendants caused the Plaintiff to denied medical insurance coverage.

As a direct and proximate result of the Defendants' unlawful restraint of trade and interference with Plaintiff's contract and/or business relationship with Dr. Batchu Plaintiff did and /or will continue to pay additional costs for transportation, have delayed medical treatment, and suffer from needless physical pain, mental anguish and emotional distress.

Duvall requested actual damages exceeding $1 million and punitive damages exceeding $6 million. The circuit court dismissed Duvall's petition for failure to state a claim upon which relief could be granted, and Duvall appeals. We affirm.

Duvall asserts that the circuit court erred in dismissing his petition because he properly stated an antitrust cause of action pursuant to § 416.031. The defendants counter by arguing that the circuit court properly dismissed Duvall's petition because Duvall lacked standing to pursue a claim for antitrust violations.

Duvall's petition averred that the defendants conspired to restrain trade in violation of § 416.031.1 and conspired to monopolize trade in violation of § 416.031.2. According to § 416.121, RSMo 1994, "Any person ... who is injured in his business or property by reason of anything forbidden or declared unlawful by sections 416.011 to 416.161 may sue" for damages sustained by him or for injunction to enjoin the unlawful practices. Section 416.141, RSMo 1994, requires that Missouri's antitrust statutes be construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes."

A comparable federal antitrust statute is the Clayton Act, and, in construing § 4 of this act,[2] the United States Supreme Court has been broad in determining who had standing to maintain a private damages action under the act: " 'The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.' " *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar Company,* 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)). *See also Associated General Contractors of California, Inc. v. California State Council of Carpenters and Carpenters 46 Northern Counties Conference Board,* 459 U.S. 519, 529, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The United States Supreme Court has said that Congress intended the act to be expansive to achieve a remedial purpose: "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." *McCready,* 457 U.S. at 472, 102 S.Ct. 2540. The court, however, has also instructed that the act is not all-inclusive: "Congress did not intend to allow every person tangentially affected

**2.** That statute provides, "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Id.* at 477, 102 S.Ct. 2540.

 Thus, in determining whether Duvall may recover for the injuries that he suffered because of the defendants' alleged restraint of trade, we must evaluate the relationship of the harm that Duvall averred with the defendants' wrongdoing that he alleged. *Associated General*, 459 U.S. at 535, 103 S.Ct. 897. In evaluating the harm to Duvall, we must consider the directness or indirectness of the asserted injury: If the harm to Duvall was only indirect, he does not have standing. *Id.* at 540–44, 103 S.Ct. 897. This is because persons indirectly harmed typically would not be motivated to vindicate the public interest in antitrust enforcement and, therefore, would not be the proper party to perform "the office of a private attorney general." *Id.* at 542, 103 S.Ct. 897.

Duvall's claimed that he suffered these injuries:

1) he was/is paying increased costs for medical services by paying higher medical fees . . .; 2) he was/is paying increased transportation costs caused by having to travel outside of the non-compete zone . . .; 3) he lost revenues by not being able to use his physician for Social Security and Long Term Disability claims . . .; and, 4) he is being damaged by foreseeable and needless pain and suffering caused by the non-compete agreement. . . .

Even if the defendants' actions constituted an illegal restraint of trade, the injuries that Duvall described resulted only indirectly from the defendants' alleged actions against Batchu. Batchu was the party directly harmed by the defendants' alleged actions; hence, the harms that Duvall described were too remote to support his claim of antitrust violations.

Duvall claimed, for instance, that he was forced to pay increased medical costs because of the defendants' actions, but his complaint concerned the increased costs that he paid for Batchu's services, not for defendants' services. The plaintiffs in *Illinois Brick Company v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), made a similar claim, and the United States Supreme Court held that damages could not be recovered by indirect purchasers of concrete blocks who had paid an enhanced price because their suppliers had been victimized by a price-fixing conspiracy. The court concluded that if it interpreted the Clayton Act as allowing direct and indirect purchasers to make a claim, the risk of duplicative recovery would be raised significantly:

> Permitting [such claims] under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge—from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

*Id.* at 737–38, 97 S.Ct. 2061. The court concluded that direct purchasers, rather than indirect purchasers, were the injured parties who were in a better position to assert an antitrust claim against the defendants. *See also Gross v. New Balance Athletic Shoe, Inc.*, 955 F.Supp. 242, 246 (S.D.N.Y.1997) and *Mid–West Paper Products Company v. Continental Group, Inc.*, 596 F.2d 573, 583–87 (3d. Cir.1979) (consumers who purchase from non-conspiring retailers do not have standing to assert an antitrust claim).

Duvall relies heavily on *McCready*, 457 U.S. at 465, 102 S.Ct. 2540 to argue that he has standing. His reliance is misplaced. The plaintiff in *McCready* was a subscriber to Blue Shield's health plan, and she sued Blue Shield, alleging that its refusing to reimburse subscribers for psychologists' psychotherapy was an unlawful conspiracy

to restrain competition in the psychotherapy market. The plaintiff noted that Blue Shield reimbursed psychotherapy provided by psychiatrists. The court considered whether the subscriber who employed the services of a psychologist had standing to maintain an action for damages under § 4 of the Clayton Act based upon Blue Shield's failure to provide reimbursement for the cost of that treatment. The court held:

> [McCready's] claim of injury is premised on a concerted refusal to reimburse under a plan that was, in fact, purchased and retained by her employer for her benefit, and that as a matter of contract construction and state law permitted reimbursement for the services of psychologists without any significant variation in the structure of the contractual relationship between her employer and Blue Shield.... As a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was "within that area of the economy ... endangered by [that] breakdown of competitive conditions" resulting from Blue Shield's selective refusal to reimburse....
>
> ....
>
> McCready charges Blue Shield with a purposefully anti-competitive scheme. She seeks to recover as damages the sums lost to her as the consequence of Blue Shield's attempt to pursue that scheme. She alleges that Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required, and that the heart of its scheme was the offer of a Hobson's choice to its subscribers. Those subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice. In the latter case, the antitrust injury would have been borne in

the first instance by the competitors of the conspirators, and inevitably—though indirectly—by the customers of the competitors in the form of suppressed competition in the psychotherapy market; in the former case, as it happened, the injury was borne directly by the customers of the competitors. McCready did not yield to Blue Shield's coercive pressure, and bore Blue Shield's sanction in the form of an increase in the net cost of her psychologist's services. Although McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market. In light of the conspiracy here alleged we think that McCready's injury "flows from that which makes defendants' acts unlawful" ... and falls squarely within the area of congressional concern.

*Id.* at 480, 483–84, 102 S.Ct. 2540.

What distinguishes *McCready* from Duvall's case is that the plaintiff in *McCready* was a subscriber of Blue Shield's health plan. As a subscriber, the court concluded that McCready's injury was "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 484, 102 S.Ct. 2540. As a subscriber to Blue Shield's health plan, McCready was, in essence, a direct purchaser. As the court explained, "[W]hatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits." *Id.* at 475, 102 S.Ct. 2540. McCready, as the subscriber, suffered the injury because she was deprived money as a consequence of Blue Shield failure to pay benefits.

In this case, Duvall's injuries were not "inextricably intertwined" with the injury the defendants allegedly sought to inflict

on Batchu and the Columbia area neurology market. Because Duvall was not seeking services from the defendants, the injuries that he suffered were merely an indirect result of whatever harm that Batchu may have suffered. Duvall's harm was tangential to the alleged antitrust violation.

 Duvall asserts that, even if he does not have standing to sue for damages, he has standing to sue for injunctive relief. In his petition, he requested an injunction ordering the defendants to stop their antitrust activities and to reduce their fees back to the rates that they charged before they terminated Batchu's employment. He also requested a judgment declaring that the defendants' territorial non-compete agreement with Batchu was a *per se* illegal restraint of trade, that he was not a patient of the defendants when they terminated their contract with Batchu, and that Batchu was not prohibited from treating him in Columbia. For the same reasons in regard to the damages issue, Duvall lacked standing to pursue such claims. Section 416.121 provides:

> 1. Any person, including the state, who is injured in his business or property by reason of anything forbidden or declared unlawful by sections 416.011 to 416.161 may sue therefor in any circuit court of this state in which the defendant or defendants, or any of them, reside, or have any officer, agent or representative, or in which any such defendant, or any agent, officer or representative may be found. Such person may:
>
> ....
>
> (2) Bring proceedings to enjoin the unlawful practices[.]

Unlike § 16 of the Clayton Act,[3] Missouri requires that a person suing for an injunction must be injured in his business or property. As we have already concluded, Duvall's injuries were too remote or too indirect to give him standing under § 416.121.

 Duvall also complains that the circuit court erred in dismissing his claim for tortious interference with contract. To succeed on this claim, Duvall bore the burden of proving (1) a contract; (2) the defendants' knowledge of the contract; (3) intentional interference by the defendants inducing or causing a breach of the contract; (4) no justification; and (5) damages resulting from the defendants' conduct. *Community Title Company v. Roosevelt Federal Savings and Loan Association,* 796 S.W.2d 369, 372 (Mo. banc 1990); *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 316 (Mo. banc 1993).

Duvall alleged that he entered into a contract for medical services with Batchu on January 1, 1998. Duvall admits that Batchu had been hired, fired and sued by the defendants before Duvall sought his medical treatment. No Missouri court has recognized a cause of action for an intentional tort of interference with contract based on alleged acts that occurred before the subject contract or business relationship occurred. Duvall cites no facts or law supporting his allegations that the defendants somehow tortiously interfered with his *anticipated* relationship with Batchu. Duvall's contention is without merit.

We affirm the circuit court's dismissal of Duvall's petition for failure to state a claim for which relief could be granted.

EDWIN H. SMITH, Presiding Judge, and FOREST W. HANNA, Judge, concur.

---

3. That section provides: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity...." 15 U.S.C. § 26.