Steven L. CLINCH, Appellant,

v.

HEARTLAND HEALTH, Heartland Midwestern Health Management, Inc., Lowell C. Kruse, and Michael E. Nellestein, Respondents.

No. WD 64853.

Missouri Court of Appeals, Western District.

Jan. 17, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 2006.

Application for Transfer Denied April 11, 2006.

John Kent Thomas, St. Joseph, for Appellant.

George Edward Leonard, Kansas City, Todd Henry Bartels, St. Joseph, for Respondent.

PAUL M. SPINDEN, Judge.

Steven L. Clinch, a heart surgeon, has sued fellow surgeon, Michael E. Nellestein, charging him with tortious interference with one of Clinch's business relationships. Clinch accuses Nellestein of being the prime cause for his losing his position as a medical director at Heartland Regional

Medical Center in St. Joseph. Clinch also sued his former employer, Midwestern Health Management, Inc., Heartland Health, Heartland Regional Medical Center, and Heartland Regional's president and chief executive officer, Lowell C. Kruse, for conspiring to restrain his trade as a surgeon by keeping him from practicing on the hospital staff. Midwestern Health Management contracted with Heartland Regional to provide Clinch's services to the hospital. Both firms were wholly owned subsidiaries of Heartland Health.

The circuit court granted summary judgment for defendants on both causes of action. We affirm summary judgment of Clinch's antitrust claims but reverse summary judgment of his tortious interference claim and remand for further proceedings.

The basis for this dispute apparently began fomenting during 1999 when Nellestein was director of Heartland Regional's vascular surgery and expressed concern that the hospital's heart program was not "moving forward effectively." Clinch was the hospital's medical director of cardiac surgery. Nellestein mentioned some of his concerns to Curtis Kretzinger, the hospital's chief operating officer, and to Steven McCamy, administrator of the hospital's medical group. When Nellestein met with Kruse during spring 1999 to discuss his pay, he presented data comparing his production with Clinch's. He met with Kruse again, sometime during late 1999 or early 2000, to discuss extending his contract and removing Scott Koellicker, an administrator who supervised the hospital's cardiac surgery, from Nellestein's chain of command.

During June 2000, while Nellestein was on leave, Clinch performed 17 surgeries. When Nellestein returned, someone told him that complications had beset Clinch's surgeries. Nellestein reviewed records of Clinch's surgeries, but he did not try to determine the complications' causes. At some point, apparently after November 2000, Nellestein recorded that the surgeries had a "35% major complication rate."

Charles Mullican, the hospital's chief medical officer, became aware of complications with Clinch's surgeries. Nellestein acknowledged that he may have told Mullican of the complications, but he did not give Mullican a written analysis or complain about Clinch's performance.

Sometime during July or August 2000, Nellestein told Kretzinger during a hallway conversation that he was not content at Heartland Regional and was considering leaving the hospital's staff. Nellestein's discontentment surprised Kretzinger. He later summoned Nellestein to his office where Nellestein expressed concerns that the hospital's heart program was "not moving forward effectively" and noted problems with infection rates, referrals, volume, and results. He expressed specific concerns about Clinch's performance, which Kretzinger characterized in sworn testimony as "vague" and part of Nellestein's general critique of the heart program.

Kretzinger told Heartland Health's Clinical Business Strategy Group that Nellestein had threatened to leave and that he was discussing a list of issues with Nellestein. Asked whether or not Nellestein had conditioned his staying at Heartland Regional on Clinch's removal, Kretzinger responded, "Absolutely not."

On August 9, 2000, Kruse, Kretzinger, and Nellestein had a dinner meeting during which Nellestein accepted Kruse's and Kretzinger's offer of Clinch's position as medical director of cardiac surgery. They discussed Clinch's future with the hospital, but whether or not Kruse and Kretzinger

decided to remove staff privileges from Clinch entirely at that meeting is disputed.

During August and September 2000, Kretzinger initiated a review of Heartland Regional's cardiac program. He ordered Cindy McCoy, a former infectious disease nurse manager at the hospital, specifically to prepare a report of Clinch's infection rates. McCoy testified that Kretzinger told her that "Heartland wanted to terminate the contract of Dr. Steven Clinch and use his high infection rates as a reason," but Kretzinger denied it in his testimony. From McCoy's review, Kretzinger found no problems with Nellestein's or Clinch's morbidity, mortality, or infection rates.

Nellestein signed new contracts with Heartland Regional on October 4, 2000. One made him medical director of the hospital's cardiac surgery, and the other was an employment agreement. Midwestern Health Management terminated its contract with Clinch during the next day. McCamy later told Clinch that his contract had been terminated "without cause." Although Heartland Regional administrators expressed willingness for Clinch to continue his staff membership and clinical privileges, Midwestern Health Management refused to release Clinch from a covenant not to compete. On October 6, Heartland Regional contracted with another cardiac surgeon, Jane Schwabe, and hospital administrators removed Koelliker from the heart program chain of command, as Nellestein had requested.

During Spring 2001, Heartland Regional's administrators realized that, because Clinch's privileges extended beyond expiration of his covenant not to compete, he would be eligible to return to Heartland Regional as a staff surgeon at the end of the year. Administrators asked an attorney to develop an exclusive contract arrangement for cardiac surgery at Heartland Regional that would prevent Clinch

from returning after his non-compete covenant expired.

During July 2001, Clinch notified Heartland Regional that he intended to return to an independent practice at Heartland Regional after his non-compete covenant expired. Mullican informed him that the hospital's board was considering an exclusive arrangement with its current cardiac surgeons. During September, the board decided to exclude, temporarily, non-employed physicians from providing cardiovascular services at the hospital, and the board made the exclusion permanent during March 2002. The exclusion prohibited Clinch from performing services at the hospital.

Clinch sued the defendants for various antitrust violations and several common law claims, including a claim against Nellestein for tortious interference. The circuit court granted defendants' motion for summary judgment on all counts, and Clinch appeals. Clinch did not appeal the circuit court's order granting summary judgment on his claims for promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation.

■ Before considering the merits of Clinch's assertion that the circuit court erred in granting summary judgment on his claim for tortious interference, we address Nellestein's argument that Clinch is raising a new issue on appeal. Nellestein complains that Clinch averred to the circuit court that Nellestein interfered with his *contract,* but now, on appeal, he asserts that Nellestein interfered with his *business relationship.*

Clinch labeled his cause of action against Nellestein as "tortious interference with contract" in both his petition and responses to defendants' motion for summary judgment. The circuit court also labeled Clinch's cause of action as "tor-

tious interference with contract." Clinch's suggestions in opposition to defendants' motion for summary judgment mentioned interference with Clinch's employment relationship. On appeal, Clinch argues that Nellestein tortiously interfered with his business relationship with Midwestern Health Management and Heartland Regional.

Appellants cannot raise new issues on appeal, but Clinch is not raising a new issue. The relationship protected by the tort of interference with a business relationship can take several forms including, most obviously, a contractual one. Indeed, the Supreme Court has noted that the protected relationship can be a "contract or a valid business relationship or expectancy." *Fischer, Spuhl, Herzwurm and Associates, Inc. v. Forrest T. Jones and Company*, 586 S.W.2d 310, 315 (Mo. banc 1979) (emphasis omitted). When Clinch referred on appeal to his business relationship with Midwestern Health Management, he obviously was referring to the same relationship that he described during circuit court proceedings as a contractual relationship.

We turn to the merits of Clinch's contention that the circuit court erred in issuing summary judgment for Nellestein. Our review of the circuit court's summary judgment is essentially *de novo*. *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation*, 854 S.W.2d 371, 376 (Mo. banc 1993). To enter summary judgment, the circuit court had to determine that the parties were not disputing any material factual issue and that the party seeking summary judgment was entitled to judgment as a matter of law. Rule 74.04(c)(6); *ITT*, 854 S.W.2d at 377.

[A] "defending party" may establish a right to judgment by showing (1) facts that negate any one of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense.

*ITT*, 854 S.W.2d at 381 (emphasis omitted). We must "sustain the trial court's award of summary judgment if the judgment can be sustained under any theory" supported by the record. *Rodgers v. Czamanske*, 862 S.W.2d 453, 458 (Mo.App. 1993) (citing *Zafft v. Eli Lilly and Company*, 676 S.W.2d 241, 243 (Mo. banc 1984)). In reviewing the circuit court's judgment, we view the record in a light most favorable to Clinch, the nonmoving party. *Lough v. Rolla Women's Clinic, Inc.*, 866 S.W.2d 851, 852 (Mo. banc 1993).

In contending that he was entitled to judgment as a matter of law, Nellestein focuses on two primary issues, both concerning elements of Clinch's cause of action. The elements of tortious interference with a business relationship are: (1) The plaintiff was involved in a valid business relationship; (2) the defendant was aware of the relationship; (3) the defendant intentionally interfered with the relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of defendant's conduct. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996).[1] Concerning the third element,

---

1. These elements were enunciated in substance in 1953 in *Downey v. United Weatherproofing Inc.*, 363 Mo. 852, 253 S.W.2d 976, 980–81(Mo.), and have been enunciated as set forth above since 1979. *Fischer, Spuhl, Herzwurm & Assoc., Inc.*, 586 S.W.2d at 315 (quot-

Nellestein first asserts that Midwestern Health Management did not breach its contract with Clinch because it had a right to terminate it at will; therefore, he could not be deemed to have induced a breach. Concerning the fourth element, Nellestein argues that his interference with Clinch's contract was justified as manifested by his not using improper means. We are not persuaded by either argument.

■■■ That Midwestern Health Management did not breach its contract with Clinch and the contract was terminable at will does not free Nellestein from liability. A third party's interference with contracts terminable at will is actionable, because, until one of the contracting parties terminates the contract, the parties are in a subsisting relation that presumably will continue and is of value to the plaintiff. *Hensen v. Truman Medical Center, Inc.,* 62 S.W.3d 549, 553 (Mo.App.2001). That Midwestern Health Management did not breach its contract with Clinch is of no consequence in determining whether or not Nellestein tortiously interfered in that relationship. The pertinent issue is whether or not Midwestern Health Management would have persisted in the contractual relationship with Clinch but for Nellestein's conduct. We find no evidence in the record that, before Nellestein's involvement, Heartland Regional or Midwestern Health Management were dissatisfied with Clinch's performance or were considering terminating their relationship with him. To the contrary, the record shows the opposite. We conclude that Clinch presented evidence from which a reasonable juror could conclude that Midwestern Health Management would not have terminated its contract with Clinch but for Nellestein's intentional conduct.

Nellestein further asserts that summary judgment was proper because his conduct was justified because he did not use improper means; hence, the circuit court correctly adjudged that Clinch could not establish the fourth element of his cause of action. This element—lack of justification—has been cause for confusion concerning the plaintiff's burden in a tortious interference action. This confusion seems to stem from the distinction between interference with existing contracts and interference with commercial expectancies or future opportunities. *E.g., Downey v. United Weatherproofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976, 980–81 (1953); RESTATEMENT (SECOND) OF TORTS §§ 766 & 766B (1979); 2 DAN B. DOBBS, THE LAW OF TORTS § 445 & § 446 at 1262 (2001 & Supp 2005); PROSSER AND KEETON ON THE LAW OF TORTS §§ 129 & 130 (W. Page Keeton ed., 5th ed.1984). The difference is significant.

Although both are protected from intentional interference by others, the courts afford greater protection for existing contracts than for business expectancies. The Supreme Court explained in *Downey,* "[T]he right to the performance of an existing contract is a right ... of greater expectancy than is the right to enter into future contracts even in a competitive field." 253 S.W.2d at 981; *see also* PROSSER AND KEETON § 129 at 978. Thus, a defendant enjoys greater latitude to interfere—that is, what constitutes justification is broader—when his or her alleged inference is with a business expectancy as opposed to an existing, ongoing contractual relationship. The Supreme Court explained, "[T]he right of free competition [to divert business from competitors] ... should be considered of less import and should be less highly protected in law than the right under a contract already entered

ing *Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233, 1238 (8th Cir.1976)).

into. *See ...* Restatement, Torts Section 768[.]" *Downey,* 253 S.W.2d at 981.

■ A defendant's interference can be justified on numerous grounds, and clear rules as to what constitutes justification do not exist. But one rule is clear: Regardless of whether plaintiff has a contract or only an expectancy, a defendant's interference is not justified if he or she employs improper means. *Community Title Company v. Roosevelt Federal Savings and Loan Association,* 796 S.W.2d 369, 373 (Mo. banc 1990) (citing PROSSER, LAW OF TORTS § 129 at 936–37 (4th ed.1971)); *Downey,* 253 S.W.2d at 982 (defendant may use lawful means to procure business even though it causes customers to refrain from doing business with the plaintiff).

But improper means is not synonymous with lack of justification. Before 1993, Missouri courts had long held that plaintiffs alleging interference with contract—as opposed to inference with other business relationships—did not need to allege fraud, deceit, coercion, or other improper means. *E.g., Downey,* 363 Mo. 852, 253 S.W.2d 976. It was enough that the defendant interfered intentionally, *without justification,* and succeeded in causing breach of plaintiff's contract. Indeed, the Supreme Court, in reviewing an early case, *Glencoe Sand and Gravel Company v. Hudson Brothers Commission Company,* 138 Mo. 439, 40 S.W. 93 (1897), commented:

> [T]he language of the *Glencoe* case ... that actionable wrong is committed not by mere persuasion but only where breach of an existing contract is induced by means of fraud, deceit or coercion is out of harmony with the majority view[.] We believe the allegation and proof of the use of fraud, deceit or coercion as a means of inducing a breach of an existing contract should be considered non-essential to a recovery for inducing the

breach of an existing contract, if ... there is alleged (and demonstrated) that the alleged wrongdoer maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach.

*Downey,* 253 S.W.2d at 980–81; *see also Cady v. Hartford Accident and Indemnity Company,* 439 S.W.2d 483, 485 (Mo.1969) (because defendant had an interest in the contract, plaintiff needed to allege facts "from which it could be found that the interference was not justified"); *Coonis v. Rogers,* 429 S.W.2d 709, 713 (Mo.1968).

The law concerning justification seemingly changed in 1993 when the Supreme Court handed down *Nazeri v. Missouri Valley College,* 860 S.W.2d 303 (Mo. banc). In apparent *dictum,* the Supreme Court seemingly declared in that case that plaintiffs in all actions for tortious interference—whether with a contract or with a business expectancy—were required to allege and to prove improper means: "If the defendant has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." *Id.* at 317.

Courts since *Nazeri* have interpreted that case to mean that plaintiffs must allege and prove in all tortious interference cases that the defendant employed improper means. *E.g., Carter v. St. John's Regional Medical Center,* 88 S.W.3d 1, 14 (Mo.App.2002). If this interpretation is correct, Missouri has reverted to the *Glencoe Sand and Gravel* approach expressly rejected in *Downey.*

In stating its proposition, the *Nazeri* court relied on *Community Title,* 796 S.W.2d at 372, in which the Supreme Court said, "Under Missouri law a plaintiff has the burden of producing substantial

evidence to establish the burden of justification.... It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interests, but in doing so employs improper means." This statement comports with *Downey* and its progeny: Using improper means to interfere will destroy any justification a defendant might otherwise assert no matter what sort of relationship was involved. *Community Title* did not involve a contract but was a dispute over a business expectancy: Community Title's expectation that Roosevelt Federal Savings and Loan would accept its title insurance policies. In that case, the Supreme Court did not say that plaintiffs must prove improper means in all tortious interference cases. It said only that plaintiffs must prove that the defendant lacked justification. Consistent with prior caselaw, *Community Title* suggested that only a showing of improper means satisfies the burden of establishing a lack of justification in a tortious interference with expectancies case.

That an ongoing contract would enjoy more protection from interference than an expectancy stands only to reason. As the Supreme Court noted in *Downey*, our society prizes free competition in the marketplace; hence, the law tolerates attempts to divert business from competitors so long as it is done by proper means. But, once a party is involved in a contract, the law is intolerant of an intermeddler's attempt to persuade the party to breach the contract-no matter what the means. *Downey*, 253 S.W.2d at 981.

Nonetheless, under the dictates of *stare decisis,* we follow the law as set forth in *Nazeri* as the Supreme Court's latest pronouncement.[2] Applying *Nazeri* to Clinch's action against Nellestein, Clinch's burden was to establish that Nellestein used improper means in interfering with Clinch's contractual relationships with Midwestern Health Management and Heartland Regional.

Clinch argues that Nellestein employed improper means by engaging in misrepresentations, defamation, threats, and antitrust violations. For reasons we explain later, we dismiss his contentions that Nellestein was involved in antitrust violations. Misrepresentations and defamation certainly would constitute improper means, but the parties are much in dispute concerning both, thwarting Nellestein's motion for summary judgment.

■ Nellestein asserts, however, that we should affirm the circuit court's summary judgment because the statements on which Clinch relies to accuse Nellestein of misrepresentations and defamation were expressions of opinion, not of fact. To support a contention of misrepresentation or defamation, Clinch must establish that he was misinforming the hospital's administrators concerning facts, not merely expressing his opinions. *Kruse Concepts, Inc. v. Shelter Mutual Insurance,* 16 S.W.3d 734, 738 (Mo.App.2000) (misrepresentation); *Willman v. Dooner,* 770 S.W.2d 275, 278 (Mo.App.1989) (defamation).

■ Whether a statement is fact or opinion is a question of law, and we make this determination based on the totality of the circumstances surrounding a given

**2.** Although the Supreme Court's statements concerning improper means were *dictum,* the court gave several reasons for dismissing Nazeri's claim for tortious interference, any one of which would have been sufficient.

*Nazeri,* 860 S.W.2d at 316–17. Thus, we treat each rationale as binding. *State ex rel. Gas Serv. Co. v. Public Serv. Comm'n,* 536 S.W.2d 491, 493 (Mo.App.1976).

statement. *Henry v. Halliburton,* 690 S.W.2d 775, 787, 788–89 (Mo. banc 1985). Generally, a doctor's expression of judgment about another doctor's quality of care is an opinion and not a statement of fact. *Willman,* 770 S.W.2d at 279. Opinions, however, become facts if they can be verified. *See Pape v. Reither,* 918 S.W.2d 376, 382 and 383 n. 4 (Mo.App.1996) ("verifiability" is leading principle in determining whether a statement presents fact or opinion).

Nellestein told Kretzinger that he was unhappy with Heartland Regional's cardiac program. He thought it was not progressing effectively, and he expressed concern about quality outcomes and infection rates, among other things. Looking to the circumstances and context surrounding these statements, he was stating only general concerns and was merely expressing opinions.

Nellestein's other statements—that Clinch had high infection rates, poor clinical outcomes, and a 35 percent complication rate with his August 2000 surgeries— are not so clear. Nellestein mentioned Clinch within the context of his overall, general critique of Heartland Regional's cardiac program. This suggests—and the circuit court concluded—that Nellestein's comments were expressions of opinion. Nellestein, however, mentioned infection and morbidity rates and-depending on when Nellestein calculated the 35 percent complication rate-may have stated that Clinch's August 2000 surgeries had a 35 percent complication rate. Whether a doctor's infection and morbidity rates are above the accepted standards and, therefore, cause for concern, are verifiable facts. *See Henry,* 690 S.W.2d at 788; *Pape,* 918 S.W.2d at 382 and 383 n. 4. Such statements refer to statistical phenomenon and are more than a general critique of another doctor's quality of care. Nellestein also

encouraged Kretzinger to investigate these matters. Kretzinger could have reasonably believed that Nellestein possessed verifiable information and was sounding an alarm, not just giving his opinion. Thus, we conclude that some of Nellestein's comments were more than mere opinion.

Nellestein argues that he and Clinch disagree as to what caused the complications in Clinch's August 2000 surgeries; therefore, the 35 percent complication rate expressed a medical opinion. The issue, however, is whether or not Heartland Regional's administrators, upon hearing such a statistical figure, could have reasonably inferred that Nellestein was providing a fact, not an opinion. They could have.

Moreover, although Clinch does not contest that his surgeries during August 2000 had a 35 percent complication rate, factual disputes remain unresolved. Clinch claims that the complication rate is false and misleading because Nellestein did not account for other factors or attempt to isolate the causes. Nellestein counters that he did not try to identify the causes and that his purpose was only to note that complications had occurred; thus, he did not consider patient history or other contributing factors. Even assuming that Clinch's surgeries had a 35 percent complication rate, this says nothing about whether or not Clinch caused the complications. Thus, if Nellestein communicated this figure to Heartland Regional's administrators without also stating that his analysis was incomplete or that he had not isolated the causes, the administrators could reasonably infer that Nellestein was accusing Clinch of causing the complications. This is particularly true in light of Nellestein's suggesting that an investigation occur. A jury could infer that Nellestein misled Heartland Regional administrators by providing a half-truth and did so intentionally

to secure the hospital's termination of its contract with Clinch.

Clinch also alleged that Nellestein misrepresented facts by telling hospital administrators that Clinch had high infection and morbidity rates and poor clinical outcomes. In response to Nellestein's statements, Kretzinger conducted an independent investigation, which revealed no problems with Clinch's performance. A jury could reasonably infer that Nellestein misrepresented facts concerning Clinch's performance.

We turn to Clinch's antitrust claims against Heartland Health, Heartland Regional, Midwestern Health Management, and Kruse. We affirm the circuit court's granting summary judgment for the defendants. The circuit court found that Clinch lacked standing as an antitrust plaintiff. We agree.

Clinch first argues that the defendants' answer did not allege substantive facts to support their affirmative defense that he lacked standing. Clinch did not raise this argument before the circuit court, so we do not address the issue except to point out that defendants raised the affirmative defense in their answer, putting Clinch on notice of their claim, and thoroughly argued the issue in their motions to dismiss and for summary judgment.

■■■ As an antitrust plaintiff, Clinch's obligation was to show that he was a competitor or consumer who suffered a direct antitrust injury. *Hamilton v. Spencer,* 929 S.W.2d 762, 767 (Mo.App.1996); *Duvall v. Silvers, Asher, Sher and McLaren, M.D.'s,* 998 S.W.2d 821, 825–27 (Mo.App. 1999); *Zipper v. Health Midwest,* 978 S.W.2d 398, 417–18 (Mo.App.1998). Because the purpose of antitrust laws is to protect competition and not individual competitors, an antitrust plaintiff must prove that a defendant's anti-competitive behavior injured consumers or competition

in the relevant market. *Brown Shoe Company v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Atlantic Richfield Company v. USA Petroleum Company,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Zipper,* 978 S.W.2d at 418. An antitrust plaintiff must point to some impact a defendant's decision had on price, quality, or quantity of service in the relevant geographic market. *Robles v. Humana Hospital Cartersville,* 785 F.Supp. 989, 998 n. 7 (N.D.Ga.1992) (cited with approval in *Zipper,* 978 S.W.2d at 417–18) (citing several cases indicating that impact on pricing or quality of service is strong indicator that anti-competitive actions have affected the market).

■■■ Clinch argues that he had standing because the defendants excluded him as a competitor from the marketplace. Even assuming *arguendo* that the defendants excluded Clinch from the market and that competitors can be proper plaintiffs, Clinch must demonstrate that the defendants injured competition by revoking his privileges.

■■■ Clinch argues that the defendants injured competition by entering into an exclusive contractual arrangement with its cardiac surgeons, thereby preventing him and those doctors without contracts with Heartland Regional from practicing at Heartland Regional. Loss of employment is not an antitrust injury, and entering into an exclusive contractual arrangement is not an antitrust violation *per se. See Jefferson Parish Hospital District Number 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

Clinch also argues that Heartland Regional's excluding him injured competition because it virtually eliminated the availability of off-pump bypass surgery, which Nellestein and Schwabe rarely performed.

Clinch contends that a "precipitous decline in the quantity of off-pump bypasses" occurred after he left Heartland Regional. Indeed, the number of off-pump bypasses dropped from 82 during his tenure to less than five in the four to five years after he departed; however, the number of off-pump bypasses that Clinch performed dropped considerably between August 1997 and August 2000. Clinch performed 43 off-pump surgeries from August 1997 to July 1998, but he performed only three off-pump surgeries during the 14 months before his termination in 2000. Thus, Clinch had himself "virtually eliminated" off-pump surgery before the defendants revoked his hospital privileges. Even assuming *arguendo* that Clinch's relevant geographic market is correct, defendants' actions had little impact on the quantity of off-pump surgeries performed at Heartland Regional. In addition, we note that the overall number of surgeries did not decline after Clinch left.

Moreover, consumers still had the option of obtaining off-pump bypass surgery at Heartland Regional after Clinch's removal from the staff. Nellestein performed several off-pump surgeries before and after Clinch departed. Nellestein performed off-pump surgery when on-pump surgery was not viable.

Clinch also cannot establish that the defendants' decision harmed pricing in an anti-competitive way. Even assuming that off-pump surgery costs less than on-pump surgery, the defendants' decision to revoke Clinch's hospital privileges had little impact on cost. By the end of Clinch's tenure, few off-pump surgeries were being performed. Thus, terminating the privileges of the surgeon who preferred off-pump surgery impacted the price of bypass surgery in the market only minimally. But, even assuming *arguendo* that the cost of bypass surgery rose at Heartland Regional, Clinch has not demonstrated that it rose to an anti-competitive level, which is required to establish that defendants' actions had an anticompetitive impact. *Zipper*, 978 S.W.2d at 418.

Hence, Clinch cannot establish that he suffered an "injury of the type the antitrust laws were intended to prevent." *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Because Clinch did not satisfy the test for antitrust standing, the circuit court did not err in granting summary judgment on Clinch's antitrust claims.

We, therefore, affirm the circuit court's summary judgment for the defendants on Clinch's antitrust claims. We reverse and remand the circuit court's summary judgment for Nellestein on Clinch's claim for tortious interference with business relationships.

LISA WHITE HARDWICK, Presiding Judge, and PATRICIA BRECKENRIDGE, Judge, concur.