[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14160
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06012-GAP-TBS

QUALITY AUTO PAINTING CENTER OF ROSELLE, INC.,
Traded as Prestige Auto Body,

Plaintiff-Appellant,

versus

STATE FARM INDEMNITY COMPANY,
STATE FARM GUARANTY INSURANCE COMPANY, et al.,

Defendants-Appellees.

_____

No. 15-14162
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06013-GAP-TBS

ULTIMATE COLLISION REPAIR, INC.,

Plaintiff-Appellant,

versus

STATE FARM INDEMNITY COMPANY,
STATE FARM GUARANTY INSURANCE COMPANY, et al.,

Defendants-Appellees.

_____

No. 15-14178
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06018-GAP-TBS

CAMPBELL COUNTY AUTO BODY, INC.,

Plaintiff-Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al.,

Defendants-Appellees.

_____

No. 15-14179
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:14-cv-06019-GAP-TBS

2

LEE PAPPAS BODY SHOP, INC.,
DAVID C. BROSIUS,
d.b.a. Martins Auto Body Works, Inc.,
ART WALKER AUTO SERVICES, INC.,
WHITEFORD COLLISION AND REFINISHING, INC.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al,

Defendants-Appellees.

_____

No. 15-14180
_____

D.C. Docket Nos. 6:14-md-02557-GAP-TBS,
6:15-cv-06022-GAP-TBS

CONCORD AUTO BODY, INC.,

Plaintiff – Appellant,

versus

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
STATE FARM FIRE & CASUALTY COMPANY, et al,

Defendants-Appellees.

3

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 7, 2017)

Before WILSON and ANDERSON, Circuit Judges, and ROTHSTEIN,[*] District Judge.

WILSON, Circuit Judge:

Automobile body shops filed five complaints, each asserting federal antitrust and state tort claims against insurance companies. The body shops appeal the dismissal of their complaints for failure to state a claim.

The automobile insurance and repair industries have customs and practices that the public frequently encounter and endorse. The public's level of familiarity, however, has no bearing on whether such customs and practices have been employed for the benefit of a long-term scheme designed to thwart antitrust and tort laws. Wary of the prejudicial effect of preconceptions about these industries, assuming as true only those facts within the four corners of the complaints, and drawing inferences from those facts only in favor of the body shops, we determine

---

[*] Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

4

that the shops pleaded enough facts to plausibly support their federal antitrust and state tort claims.  We reverse the dismissal of those claims.

## I.    Introduction

In their complaints, the body shops argue that the insurance companies engaged in two lines of tactics in pursuit of a single goal: to depress the shops' rates for automobile repair.  The first line of tactics was designed to set a "market rate," which reflected not the forces of the market but an artificial rate that would benefit only the insurance companies.  The second line of tactics was designed to pressure the body shops into accepting the market rate by steering insureds away from the non-compliant shops that charged more than the rate.  The body shops argue that the insurance companies' concurrent lines of tactics violated both federal antitrust and state tort laws.

The body shops argue two types of antitrust violations.  First, the body shops argue that the insurance companies engaged in horizontal price fixing, an illegal agreement among competitors to fix prices.  Instead of pleading facts that directly support the existence of an agreement, the body shops plead facts supporting circumstances—such as parallel conduct, adoption of a uniform price despite variables that would ordinarily result in divergent prices, and uniform practices— from which the shops infer the existence of an agreement.  Second, the body shops argue that the insurance companies boycotted the non-compliant shops that

5

charged more than the fixed prices by enlisting unwitting insureds into their scheme. Specifically, the body shops argue that the insurance companies steered insureds away from the non-compliant shops with misleading or false statements about the shops' business integrity and quality.

Arguing the commission of three state torts, the body shops assert that the insurance companies were unjustly enriched, deprived the shops of quantum meruit, and tortiously interfered with potential business of the shops.

Because the body shops plead enough facts to plausibly support their federal antitrust and state tort claims, we reverse the dismissal of those claims.

## II.    Factual Allegations[1]

### A. The insurance companies generate a significant portion of the body shops' revenues.

The body shops operate in Kentucky, Missouri, New Jersey, and Virginia. The insurance companies offer policies in these states and collectively control approximately 65% of the private passenger automobile insurance market in Kentucky, 85% in Missouri, 72% in New Jersey, and 100% in Virginia. Of the insurance companies, the State Farm companies have the largest market share: they

---

[1] Reviewing a dismissal for failure to state a claim, we accept the factual allegations as true and draw all reasonable inferences in favor of the claimant. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004). The facts as pleaded in the complaints, and viewed in the light most favorable to the plaintiffs, are as follows.

control approximately 22.3% of the private passenger automobile insurance market in Kentucky, 22.88% in Missouri, and 14.85% in Virginia.[2]  The insurance companies' insureds generate 60% of the Kentucky body shop's revenue and between 70% and 95% of the revenue of each of the remaining body shops.  Most of the insurance companies are subsidiaries or affiliates, or are otherwise related.

**B.  First line of tactics: The insurance companies select the "market rate" at which they reimburse the body shops.**

The insurance companies refuse to reimburse the body shops at more than the "market rate," which is a term that appears in direct repair program (DRP) agreements between the companies and certain body shops.  Under a DRP agreement, an insurance company lists a body shop as a "preferred provider" in exchange for the company's paying the shop no more than the "going rate in the market area."  However, even if a body shop does not participate in an insurance company's DRP, the company refuses to reimburse the shop at more than the market rate.  None of the plaintiff body shops participates in a defendant insurance company's DRP.[3]

---

[2] The New Jersey complaints do not allege State Farm's control of that state's private passenger automobile insurance market.

[3] The Missouri body shop participated in State Farm's DRP for ten years; State Farm eliminated the shop from the program in 2013 after the shop refused to implement the company's parts procurement program.

7

The market rate comprises the market labor rate and the market materials costs, both of which the insurance companies select.  The insurance companies use the market labor rate that one company, State Farm, determines by using a method that is unverified and the results of which State Farm manipulates.  Also, the insurance companies depress the market material costs by pressuring body shops into using inferior parts and into offering discounts and concessions.

### 1. The insurance companies use the market labor rate that one company determines and manipulates.

In determining the market labor rate that all of the insurance companies use, State Farm uses an unverified "half plus one" method of calculation and manipulates the result.[4]  The half plus one method (1) calculates half plus one—an amount we designate as "n"—of the total number of employees or work bays (whichever is fewer in each body shop) in the market area; (2) lists the shops in a market area from the shop with the fewest employees or work bays to the shop with the most; and (3) declares the market labor rate as the labor rate of the shop that employs the n-th employee or work bay.  It is unclear how the method designates a market area.  No insurance company other than State Farm has attempted to independently verify the results of this method.

---

[4] In addition to using the market labor rate, the other insurance companies have specifically advised the body shops that the companies "will pay no more than State Farm pays for labor."

8

In addition to using an unverified method of calculating the market labor rate, State Farm manipulates the results of the method by affecting the inputs. First, State Farm affects the labor rate that a body shop submits through an online survey compiling information used in the half plus one method.  A body shop that enters a DRP agreement with State Farm can fill out a survey about the shop's labor rate through an electronic forum, State Farm's Business to Business portal. State Farm can and does manipulate a body shop's survey submission.  Second, State Farm affects the inputs used in the half plus one method by removing a body shop that charges a higher labor rate from the DRP.  If a DRP body shop tries to charge more than the market labor rate, State Farm first tells the shop that it is the only shop that is attempting to raise its labor rate—when in fact several shops have done the same.  If the DRP body shop continues to charge a higher labor rate, State Farm threatens to and does remove the shop from the DRP.  Thus the labor rate of the body shop no longer contributes, even facially, to the calculation of the market labor rate.

By using an unverified method of calculating the market labor rate and by manipulating the results, State Farm achieves a wholly artificial market labor rate.

> ### 2. The insurance companies lower the market materials costs by pressuring the body shops into using inferior parts and into offering discounts and concessions.

The insurance companies depress the market material costs.  They use tactics such as requiring a body shop to repair a faulty part rather than installing a replacement part, even when the shop strongly recommends against continued use of the faulty part; requiring a shop to install a used or recycled part, even when a new part is available and would be best; and requiring a shop to offer discounts and concessions, even if doing so will force the shop to operate at a loss.

3. ***The resulting market rate is arbitrary and inconsistent with leading collision repair estimating databases.***

The resulting market rate is arbitrary and inconsistent with three leading collision repair estimating databases, ADP, CCC, and Mitchell, on which the insurance companies selectively rely.  For example, insurance companies strictly adhere to the labor time estimated by a database, yet they argue that materials costs are included in a repair estimate (the amount that the companies would have to pay) although the databases state that the costs are not included in an estimate. The Kentucky and Missouri complaints include allegations about an employee of Safeco Insurance Company who stated that "the corporate direction given was" for the employee to pay a body shop in accordance with the databases only "when it was financially advantageous to the insurer to do so."  This practice of creating arbitrary rates forces a body shop either to perform an incomplete or substandard repair—which prevents the shop from fulfilling an obligation to a customer to

10

return a vehicle to its pre-accident condition—or to accumulate costs without compensation—which jeopardizes the shop's business.[5]

### C. Second line of tactics: The insurance companies force compliance with their artificial market rate.

The insurance companies force the body shops to charge at or less than the market rate with misleading or false statements to insureds about a non-compliant shop's business integrity and quality. For example, the insurance companies tell an insured that the body shop takes longer to repair (and that the company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop's work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop. The statement that a body shop takes longer is misleading because any delay by a shop is caused by an insurance company's delay in sending an appraiser to inspect an insured's vehicle.[6] Also, the statement that an insurance company cannot guarantee the body shop's work is misleading because the company does not guarantee the work of any shop. Finally, the insurance companies make the

---

[5] The body shops attached as an exhibit to each complaint a "non-exhaustive list of procedures and processes the [d]efendants refuse to pay and/or pay in full."

[6] The New Jersey body shops allege that the GEICO companies in particular delay supplemental payments and delay re-inspecting vehicles. After finally inspecting a vehicle, a GEICO inspector would refuse to pay a body shop because the bill is "too old." If the insured also refuses to pay the bill, the body shop must absorb the unpaid cost.

11

remaining statements without ascertaining the truth of the statements and with the

intent to disparage a non-compliant body shop's business integrity and quality.

## III.    Procedural History

Initially, the body shops sued in the states in which they are located.

Because the actions involved similar antitrust and tort claims, the Judicial Panel on

Multidistrict Litigation transferred the actions to the Middle District of Florida for

consolidated pretrial proceedings.  This appeal is by body shops in five of fourteen

actions that were dismissed.  Although the district court granted the body shops an

opportunity to amend their complaints, the shops in the five actions chose to appeal

instead.[7]

## IV.    Standard of Review

We review de novo a dismissal for failure to state a claim.  *Spanish Broad.*

*Sys.*, 376 F.3d at 1070.  We must reverse the dismissal if the complaint "state[s] a

claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678,

129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570,

127 S. Ct. 1955, 1974 (2007)), after we accept the factual allegations as true and

---

[7] "Generally, an order dismissing a complaint is not final and appealable unless the order holds that it dismisses the entire action or that the complaint cannot be saved by amendment. . . . However, [in this circuit] the plaintiff need not wait until the time for amendment expires; he can waive the right to later amend, treat the dismissal as final, and file a notice of appeal before the expiration of the amendment period." *Van Poyck v. Singletary*, 11 F.3d 146, 148 (11th Cir. 1994) (per curiam).

12

draw all reasonable inferences in favor of the claimant, *see Spanish Broad. Sys.*, 376 F.3d at 1070.

An antitrust complaint must include allegations "plausibly suggesting (not merely consistent with)" an illegal agreement among the defendants. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966). This requirement "reflects"—and does not exceed—"the threshold requirement of Rule 8(a)(2) [of the Federal Rules of Civil Procedure] that the [complaint's] plain statement [of a claim] possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966 (internal quotation marks omitted); *see also id.* at 570, 127 S. Ct. at 1974 (clarifying that an antitrust claim is not subject to a "heightened" pleading standard).

## V. Federal Antitrust Claims

### A. Horizontal Price Fixing

#### 1. A price fixing agreement can be inferred in the absence of direct evidence of an agreement.

Under 15 U.S.C. § 1 of the Sherman Antitrust Act, any unreasonable contract, combination, or conspiracy in the restraint of interstate trade or commerce is illegal. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S. Ct. 1515, 1519 (1988) (interpreting § 1 "to prohibit only unreasonable

13

restraints of trade"). Generally, a plaintiff must demonstrate that such a contract, combination, or conspiracy is "unreasonable and anticompetitive"; in other words, we ordinarily apply the "rule of reason." *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 1279 (2006). Certain classes of conduct, however, are deemed "per se" violations, which are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S. Ct. 2613, 2617 (1985).

An example of a per se violation is horizontal price fixing, *Jacobs*, 626 F.3d at 1334, which must involve an agreement among competitors, "tacit or express," *see Twombly*, 550 U.S. at 553, 127 S. Ct. at 1964 (internal quotation marks omitted). If the existence of the agreement is in doubt, the agreement can be inferred. *See id.* Necessary for this inference is "parallel conduct or interdependence," ideas that are often used interchangeably. *See id.* at 554, 127 S. Ct. at 1964; Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1411 (3d ed. 2012). An example of parallel conduct is "conscious parallelism," which is:

> the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S. Ct. 2578, 2590 (1993); *see also Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1291 (11th Cir. 2003).  Interdependence, also known as "interdependent parallelism," "means that the profitability of [a company's] decision depends upon rivals' reactions."  Areeda ¶¶ 1434a, 1434c.

However, a party claiming horizontal price fixing based on an inferred agreement must show more than parallel conduct, which on its own "falls short of conclusively establishing agreement or . . . constituting a Sherman Act offense." *Twombly*, 550 U.S. at 553, 127 S. Ct. at 1964 (internal quotation marks omitted); *see also id.* at 554, 127 S. Ct. at 1964 (finding that parallel conduct appears in "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").  Thus, in the absence of direct evidence of an agreement, an antitrust claimant must show not only "parallel conduct" but also "further factual enhancement."  *Id.* at 557, 127 S. Ct. at 1966; *see also Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017).

Often labeled "parallel plus" or "plus factors," *see, e.g.*, *Twombly*, 550 U.S. at 553, 127 S. Ct. at 1963 (discussing the practice in the Second Circuit); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013), these factual enhancements "serve as proxies for direct evidence of an agreement,"

15

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).  This circuit has never prescribed factors or a combination of factors that may be sufficient to tip parallel conduct into the domain of per se violation.  *Compare Williamson Oil*, 346 F.3d at 1301, *with In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (prescribing which "'plus factors' [a]re important when evaluating circumstantial evidence of concerted action").  Instead, this circuit has determined that "any showing by [a plaintiff] that tends to exclude the possibility of independent action can qualify as a plus factor."  *Williamson Oil*, 346 F.3d at 1301 (internal quotation marks omitted); *see also Almanza*, 851 F.3d at 1069 (reproducing and refuting the plaintiffs' list of "further factual enhancement[s] needed to support a plausible inference of an agreement").

Because we do not prescribe plus factors, we do not assign a predetermined weight to a factor; we decide a factor's importance only after reviewing it in the context of the facts of the case and determining its tendency "to exclude the possibility of independent action."  *See Williamson Oil*, 346 F.3d at 1301 (internal quotation marks omitted); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015) ("But plaintiffs' plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent

16

market."). In the same vein, we do not prescribe how many plus factors would be necessary to establish an illegal agreement; the number of factors present has no bearing on whether an antitrust claimant has established an illegal agreement.

### 2. *The body shops' allegations readily and plausibly establish an inferred agreement.*

The body shops' allegations, accepted as true, readily and plausibly establish both parallel conduct and the "further factual enhancement needed to support a plausible inference of an agreement." *See Almanza*, 851 F.3d at 1069. The body shops plausibly establish parallel conduct; they allege that the insurance companies adopted the same labor rate and materials costs and employed the same line of tactics to depress the rate and costs. *See Williamson Oil*, 346 F.3d at 1304 ("As evidenced by the repeated, synchronous pricing decisions that occurred within the tobacco industry between 1993 and 2000, appellees plainly priced their products in parallel.").

Also, the body shops plausibly establish further factual enhancement. The body shops identify two plus factors that together support a plausible inference of an illegal agreement:

> [1] Conduct that probably does not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties[; and] . . .

17

> [2] whether the defendants have been uniform in their actions[.]

The first is a well-recognized plus factor—the presence of "[c]ustomary indications of traditional conspiracy"—and supports an inference of an illegal agreement here. *See* Areeda ¶ 1434b; *id.* ¶ 1434b n.20 (listing "unnatural parallelism" as an example of a customary indication of traditional conspiracy); *id.* ¶ 1425 (defining unnatural parallelism as "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); *Twombly*, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n.4 (citing the Areeda treatise for the proposition that unnatural parallelism is an illegal agreement). One customary indication of traditional conspiracy is a group's *adoption of a uniform price despite variables that would ordinarily result in divergent prices. See, e.g.*, *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 713, 68 S. Ct. 793, 809 (1948) ("The use of the multiple basing point delivered price system by the cement producers has been coincident with a situation whereby for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers."); Areeda ¶ 1434b (stating that customary indications of traditional conspiracy are present if rivals place "simultaneous

18

identical bids on a made-to-order product not readily assembled from standard and conventionally priced items").

According to the body shops, the insurance companies "specifically advised the [shops] they will pay no more than State Farm pays" despite variables that would ordinarily contribute to divergent amounts of reimbursement. For example, the insurance companies utilized State Farm's market rate although the rate necessarily depends on how each company defines a market. This definition can depend on factors such as the geographic area that an insurance company offers services, the locations that the company has physical offices, and the company's relationship with the body shops in certain areas. Also, the insurance companies utilized State Farm's market rate although the companies have the ability to differentiate themselves by offering reimbursement for repairs using high quality parts (e.g., only "replacement parts" from original manufacturers rather than repaired faulty parts from insureds' cars and "used or recycled parts" from other cars) and highly skilled labor. Finally, the insurance companies utilized State Farm's market rate although the companies conduct business with different body shops, which would charge different labor prices. A customary indication of traditional conspiracy is present here and contributes to a plausible inference of an illegal agreement.

19

The second plus factor—uniform practices—also favors finding an illegal agreement.  The body shops allege that the insurance companies all engaged in the first line of tactics, which included requiring a shop to repair a faulty part rather than install a replacement part; to install a used or recycled part; and to offer discounts and concessions, even to the detriment of the shops offering such discounts and concessions.  Also, the body shops allege that the insurance companies all engaged in the second line of tactics.  Although this line of tactics primarily aims to force the body shops into compliance with the market rate, the tactics aid also in creating an artificial market rate.  The tactics include stating to an insured that a body shop takes longer to repair (and that the insurance company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop's work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop.  Each statement is either misleading or false.  Each insurance company's use of this same collection of tactics contributes to a plausible inference of an illegal agreement.

The body shops' allegations readily and plausibly establish the existence of parallel conduct, adoption of a uniform price despite variables that would ordinarily result in divergent prices, and uniform practices, all from which we can

20

infer the existence of an illegal agreement.  *See Twombly*, 550 U.S. at 572, 127 S. Ct. at 1975.  We reverse the dismissal of the price fixing claims.

### 3. *The arguments against the plausible inference of an illegal agreement fail.*

Dismissing the price fixing claims, the district court states—and the insurance companies recite on appeal—that, "aside from conclusory allegations that it exists, the Plaintiffs offer no details at all in the Amended Complaint about the alleged agreement, such as how the Defendants entered into it, or when." However, allegations directly supporting the existence of an agreement, such as form (written or oral) and date of entry, are unnecessary for a plausible claim of horizontal price fixing.  In the absence of direct evidence of an agreement, the allegations necessary are those that plausibly establish parallel conduct and further factual enhancement.  "Asking for plausible grounds to infer an agreement . . . simply calls for enough fact to raise a *reasonable expectation that discovery will reveal evidence of illegal agreement*."  *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965 (emphasis added).[8]

The insurance companies argue that the body shops fail to allege an agreement to fix a price because the "market rate" is a mere "ceiling" on what the

---

[8] Notwithstanding our disagreement with the district court's analysis, we would like to recognize the tremendous effort that the district court expended in handling a multidistrict litigation of this scale.

companies are willing to pay.  However, whether the market rate in fact functions

as a ceiling or as the rate at which the insurance companies reimburse the body

shops is inapposite.  "[A]greements to fix maximum prices" are likewise per se

violations that "cripple the freedom of traders and thereby restrain their ability to

sell in accordance with their own judgment."  *See State Oil Co. v. Khan*, 522 U.S.

3, 11, 118 S. Ct. 275, 280 (1997) (internal quotation marks omitted).

Also, the insurance companies argue that the body shops' plus factors are

not properly before us because the shops argued their existence for the first time on

appeal.  Although the body shops have not used the phrase "plus factors," the

shops have consistently argued that their allegations support the inference of an

illegal agreement.  And use of the phrase "plus factors" is not necessary for the use

of these factors on appeal.  As we have explained, "any showing by appellants that

tends to exclude the possibility of independent action can qualify as a plus factor."

*Williamson Oil*, 346 F.3d at 1301 (internal quotation marks omitted).  Even this

circuit's precedent has not always used the phrase to characterize "further factual

enhancement needed to support a plausible inference of an agreement."  *See*

*Almanza*, 851 F.3d at 1069; *Jacobs*, 626 F.3d at 1343.  The body shops' recent use

of the phrase "plus factors" does not change the fact that they have consistently

argued that the allegations support the inference of an illegal agreement.

22

The Dissent, although agreeing with the existence of parallel conduct, argues that the proposed plus factors fail to "bear the weight attributed to them." Dissent at 6. Challenging the first plus factor—the insurance companies' adoption of a uniform price despite variables that would ordinarily result in divergent prices—the Dissent disputes that "auto body repairs" are "the type of made-to-order product not readily assembled from standard and conventionally priced items." Dissent at 11. In support, the Dissent substitutes allegations in the complaint with an external knowledge of auto repair:

> Certainly, some parts—such as spark plugs, windshield wipers, brakes, and tires—may be standard across many makes and models of cars, while others—such as doors, windshields, headlights, and fenders—may only fit a few. But for the overwhelming majority of cars, the necessary parts are ubiquitous, interchangeable, and standardly priced.

*See* Dissent at 12. Although *Iqbal* instructs us to "draw on [our] judicial experience and common sense," *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950, what automobile parts are necessary for repairs and whether those parts are "ubiquitous, interchangeable, and standardly priced" are hardly "judicial experience" or "common sense." The Dissent's substitution based on external knowledge belies the "the tenet that a court must accept as true all of the allegations contained in a complaint." *Id.* at 678, 129 S. Ct. at 1949. And the substitution is not an inference

23

in favor of the claimants, the body shops. *See Spanish Broad. Sys.*, 376 F.3d at 1070. Rather, it is the opposite. Review of the body shops' allegations does indeed reveal variables that would ordinarily result in divergent prices: the shops allege that they use parts from different sources (e.g., "replacement parts" from original manufacturers, repaired faulty parts from insureds' cars, and "used or recycled parts" from other cars) and charge different prices for the labor required to install the parts.

Also, challenging the first factor, the Dissent compares the allegations of this case to the facts in *Cement Institute*, which involved sealed bids to supply cement for the same price per barrel. *See* 333 U.S. at 713, 68 S. Ct. 809. The Dissent compares first the secrecy of the bids in *Cement Institute* with the brazenness of the insurance companies' declaration that "they will pay no more than State Farm pays." *See* Dissent at 9–10. However, secrecy is not necessary for the first plus factor—adoption of a uniform price despite variables that would ordinarily result in divergent prices—"to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965. Also, the Dissent compares the fact that the cement companies in *Cement Institute* agreed upon a specific price ($3.286854 per barrel) with the fact that the insurance companies here declared that "they will pay no more than State Farm pays." *See*

24

Dissent at 10. But the per se violation of horizontal price fixing includes an agreement "formed for the purpose and with the effect of raising, depressing, fixing, *pegging*, or stabilizing" prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S. Ct. 811, 844 (1940) (emphasis added).

Challenging the second plus factor, the Dissent argues that the body shops' tactics are "among the most common and time-worn methods of increasing corporate profits in any industry." Dissent at 15. This argument, however, relies on the Dissent's external knowledge about practices commonplace in the automobile industry and consequent derogation of the severity of the tactics alleged in the complaint. Again, we must look only within the four corners of the complaint. The complaints contain extensive allegations about the concerning practices of insurance companies that make the same misleading or false statements about certain body shops to ensure that the amount that the companies must reimburse the shops stays low. They contain the practices of insurance companies that all force body shops to install parts that the shops believe are unsafe and force shops to offer discounts and concessions at the risk of losing between 70% and 95% of their revenue (60% for the Kentucky body shop). The Dissent's external knowledge about these practices is inapposite to whether these

25

practices violate federal antitrust law.  The Dissent's external knowledge is inapposite to this review of the sufficiency of the complaints.[9]

## B. Boycotting

The Sherman Act's prohibition of any unreasonable contract, combination, or conspiracy in the restraint of interstate trade or commerce extends to a prohibition of boycotting.  *See* 15 U.S.C. §§ 1, 1013(b); *St. Paul Fire & Marine Ins. v. Barry*, 438 U.S. 531, 541, 98 S. Ct. 2923, 2929 (1978).  "The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins.*, 438 U.S. at 541, 98 S. Ct. at 2930.  Boycotting that is per se illegal involves "horizontal agreements among direct competitors."  *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135, 119 S. Ct. 493, 498 (1998).  The "ultimate target" of the agreement can be either a competitor or "a customer of some or all of the [boycotters] who is being denied access to desired goods or services because of a refusal to accede to particular terms set by some or all of the [boycotters]."  *St. Paul Fire & Marine Ins.*, 438 U.S. at 543, 98 S. Ct. at 2931.

---

[9] The Dissent disputes both plus factors by emphasizing the absence from the complaints of a statement in the body shops' brief: that the insurance companies used identical "scripts" to steer insureds away from noncompliant shops.  *See* Dissent at 13–14.  Also, the Dissent emphasizes that "the body shops' [brief] takes undue liberties in construing the allegations that can be fairly read from their pleadings."  Dissent at 1 n.1.  The absence from the complaints of the allegation about "scripts" and other "constructions" of the allegations is inapposite to the soundness of the allegations that are present in the complaint.

26

Accepted as true, the body shops' allegations readily and plausibly establish the per se violation of boycotting. The body shops allege that the insurance companies targeted non-compliant shops by keeping insureds away until those shops charged at or less than the market rate. And the body shops allege that, in accordance with the agreement, the insurance companies used identical tactics to keep insureds away. Specifically, they allege that the insurance companies made misleading or false statements about the body shops' business integrity and quality, including that a shop takes longer to repair (and that the company would not pay for a rental car after a certain number of days); that the company cannot guarantee the shop's work as it does for other shops; that the shop offers lower quality services; and that previous customers had complained about the shop. We reverse the dismissal of the boycotting claims.

Challenging this reversal, the Dissent argues that, because the insurance companies can choose from an ambit of different (and commonplace) tactics, the tactics are not uniform. In support, the Dissent draws an analogy to people choosing from different but limited modes of transportation (car, bike, train, etc.) to reach the same destination. This analogy again belies allegations in the complaint that each tactic was misleading or false. As compared to the common and limited means of transportation, the insurance companies' misleading or false

27

tactics together create an idiosyncrasy, the repetition of which is hardly "common." The insurance companies' use of the same ambit of tactics "raise[s] a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

## VI.    State Tort Claims

In addition to claiming antitrust violations, the body shops claim that the insurance companies committed state torts, three of which are on appeal: unjust enrichment, quantum meruit, and tortious interference.  Because the body shops' allegations plausibly support each claim, we reverse the dismissal of the claims.

### A. Unjust Enrichment

Generally, unjust enrichment requires a showing that a plaintiff conferred a benefit on a defendant that the defendant knew about and that allowing the defendant to retain the benefit without payment would be unjust.  *See Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009); *JB Contracting, Inc. v. Bierman*, 147 S.W.3d 814, 819 (Mo. Ct. App. 2004); *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (2007); *Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008).  The allegations readily and plausibly establish the claims of unjust enrichment.  The body shops allege that the shops conferred benefits by providing repair services at the low price that the insurance companies collectively selected.  Also, the body shops allege that the insurance companies not only knew about the

28

benefits but also forced the shops to confer the benefits with two lines of tactics: first selecting a low market rate and second pressuring the shops into accepting the market rate.  If we assume the truth of these allegations, the body shops have stated claims for unjust enrichment.  We reverse the dismissal of the unjust enrichment claims.

Both the district court and the Dissent reject the claims for unjust enrichment based on the argument that, because the body shops knew how much they were going to be paid before repairing cars, these claims for unjust enrichment are based on buyer's remorse—based on unsatisfactory bargaining by the shops—and that the claims are for post hoc judicial determination of a reasonable rate for the repairs.  This argument is based on a mistaken assumption that any dealing between the body shops and the insurance companies was based on a valid contract.  *See* Dissent at 27–28 ("They were not threatened or tricked.  They were not coerced.").  Assuming the truth of the allegations and drawing inferences in favor of the body shops, the insurance companies forced the shops to perform repairs, and any dealing between the shops and the companies was based on an invalid, unenforceable contract.  "[A] liability in respect of benefits already received [should not] be imposed (or measured) by the terms of an invalid contract."  Restatement (Third) of Restitution and Unjust Enrichment § 33 cmt. d

29

(2011); *see also id.* ("Liability in contract [is] distinguished from liability in restitution." (emphasis omitted)).

The district court dismissed the body shops' claims for unjust enrichment by faulting the shops for failing to bargain with the insurance companies. In imposing this requirement to bargain, the court cited a comment in the Third Restatement of Restitution and Unjust Enrichment entitled "*Benefits voluntarily conferred*": "Instead of proposing a bargain, the restitution claimant first confers a benefit, then seeks payment for its value. When this manner of proceeding is unacceptable—as it usually is, if the claimant neglects an opportunity to contract—a claim based on unjust enrichment will be denied." *Id.* § 2 cmt. d. However, the body shops consistently allege that the insurance companies forced the shops to confer benefits; that the shops *involuntarily* performed repairs at the low market rate.

Disputing the resolution of the unjust enrichment claims, the Dissent warns of a world in which parties can renege on the terms of a contract by suing for unjust enrichment. The Dissent offers an example of a painter who could contract to paint a home for $10,000 and then recover $5,000 based on an argument that the actual market rate was $15,000. The Dissent offers a second example of a circumstance in which the result is the same despite less parity in bargaining power. These analogies, designed to demonstrate an absurd result, derive from the

30

Dissent's assumption that the body shops' claims are based on unsatisfactory bargaining by the shops. However, the allegations, assumed as true, establish that no bargaining occurred that could support the existence of an enforceable agreement. Also, our ruling has no bearing on whether the body shops will later successfully prove the invalidity of the contracts under which they repaired the vehicles of the defendant companies' insureds. Even if the parties did bargain and the issue becomes whether the disparity in bargaining power was such that would invalidate the contract, determining the extent of disparity compels, at the very least, discovery.

## B. Quantum Meruit

Generally, quantum meruit requires a showing that a plaintiff with a reasonable expectation of compensation rendered valuable services to a defendant who knew about the services but refused to pay reasonable value for the services. *See Quadrille Bus. Sys. v. Ky. Cattlemen's Ass'n, Inc.*, 242 S.W.3d 359, 366 (Ky. Ct. App. 2007); *Starkey, Kelly, Blaney & White v. Estate of Nicolaysen*, 172 N.J. 60, 68 (2002); *Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992) (applying Virginia law).[10] The allegations readily and plausibly establish the claims for quantum meruit. The

---

[10] The Missouri complaint contains no claim for quantum meruit.

31

body shops allege that they rendered repair services, expecting compensation; that the services were in fact for the insurance companies, which were obligated to pay the shops in accordance with the companies' relationship with their insureds; and that the companies paid an artificial price, below the reasonable value for the services. Also, the body shops allege that the insurance companies demanded discounts and concessions for the companies' insureds; such additional services were provided to the companies, who refused to pay any compensation for those services. If we assume the truth of these allegations, the body shops have stated claims for quantum meruit. We reverse the dismissal of the claims.

## C. Tortious Interference

Generally, tortious interference requires a showing of a valid business relationship or expectancy that would have occurred but for the defendant's improper or malicious interference, which resulted in damages. *See Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012); *Clinch v. Heartland Health*, 187 S.W.3d 10, 14 (Mo. Ct. App. 2006); *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305–06 (2001); *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 216 (2014). The allegations readily and plausibly establish the claims of tortious interference. The body shops allege (1) that the insurance companies prevented insureds willing to use the shops from doing so with misleading or false statements about the shops' business integrity and quality and

32

(2) that this prevention resulted in the loss of business. Also, the body shops allege that the insurance companies forced the shops to perform incomplete or substandard repairs, which prevented the shops from fulfilling obligations to customers to return vehicles to their pre-accident conditions and which negatively affected business. If we assume the truth of these allegations, the body shops have stated claims for tortious interference.

In dismissing the body shops' claims for tortious interference, the district court faulted the shops for filing a so-called "group pleading," which prevented the shops from tailoring their allegations to the claim of tortious interference in each state. Although the complaints are largely similar, the complaints as they stand include sufficiently tailored allegations for us to conclude the plausibility of the claim of tortious interference in each state. For example, the complaints specify for each state the insurance companies that used State Farm's market rate, the market dominance of the defendant companies, and the percentage of revenue that the defendant companies generated for a body shop—all of which establish the companies' command over a shop in each state. These individualized allegations lend credence to the claims that the insurance companies exercised enough control over insureds' choice of body shops to affect the profitability of the shops.

33

Also, in dismissing the tortious interference claims, the district court stated that, "at a minimum, Plaintiffs should allege sufficient facts specific to each Defendant, or at least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged." It is unclear why such allegations are necessary; in a complaint alleging uniformity of the insurance companies' price and practices, requiring the body shops to include allegations about each company can only result in needless repetition. Further, the complaints specified two insurance companies as engaging in tortious interference: State Farm, for its role in determining the market labor rate, and GEICO, for its delay in payment and re-inspection.[11] We reverse the dismissal of the tortious interference claims.

## VII.    Conclusion

At no point did the body shops claim to know when, where, and how the insurance companies agreed to fix a market rate and to boycott those who charged more—nor did the shops have to. "Asking for plausible grounds to infer an agreement . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965. The body shops have supplied enough allegations to raise such a reasonable expectation. The body shops have consistently alleged the existence

---

[11] As stated above, the allegations about GEICO appear only in the New Jersey complaints.

34

of parallel conduct and of plus factors allowing a plausible inference of an illegal

agreement.  And the allegations have sufficiently established the body shops' state

tort claims of unjust enrichment, quantum meruit, and tortious interference.  We

reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

ANDERSON, Circuit Judge, concurring in part in the judgment and dissenting in part:

I concur with the majority in that I too would reverse the district court's dismissal of the tortious interference claim. However, because I have significant concerns with the analysis of that claim, I join in that portion of the opinion only as to the result. Additionally, because I am of the opinion that the body shops have failed to plausibly allege the existence of the agreement required to state a federal antitrust claim and have failed to adequately plead their other state law claims, I would affirm the district court's dismissal of those causes. Accordingly, I concur in the judgment of the majority opinion with respect to Part VI.C. With regard to the remainder, I respectfully dissent.

## VIII.    Introduction

I do not differ substantially from the majority in its framing of the relevant facts of this case. Based on the allegations in the complaints,[1] I accept that the

---

[1]    At the outset, I pause to address two issues regarding the complaints. The first is merely an observation of the time-worn principle that it is only the factual allegations contained therein which we must accept as true. In my opinion, the body shops' appellate briefing takes undue liberties in construing the allegations that can be fairly read from their pleadings. The district court dismissed these claims without prejudice and, therefore, the body shops had an opportunity to amend their complaints to include any additional allegations that may have been omitted from their initial pleadings. Having chosen not to do so, they are not permitted to simply "insert" new allegations through their appellate briefing. These gaps—between the allegations of the complaints and the allegations of the appellate briefing—are discussed, where relevant, below.

Secondly, I note that this appeal is a consolidation of five cases and, therefore, there are five complaints in the record. References in this opinion to the "complaints" can be considered a

36

insurance companies have engaged in a series of actions that are designed to depress the amounts they pay to body shops—including to those body shops that are not signatories to a DRP agreement. I accept, for instance, that State Farm sets a market labor rate, that other insurance companies advise the body shops that they will pay no more than State Farm, and that, in setting this rate, State Farm: uses a methodologically unsound "half-plus-one" technique; manipulates survey data; threatens and effectuates removal of noncompliant shops from its "preferred providers" list; and explicitly demands that shops lower their rates if they want to be preferred providers. I also accept that the insurance companies refuse to pay for new parts, that they require the use of aftermarket or salvaged parts, and that they: utilize industry-standard databases only when financially advantageous to them; refuse to reimburse the cost of certain procedures and materials; require the shops' participation in their parts procurement processes; and insist on discount programs. Lastly, I accept that the insurance companies engage in "steering," that they discourage insureds from patronizing noncompliant repair shops through "misrepresentation, insinuation, and casting aspersions," and that they erroneously

collective reference to all of them. References to a "complaint" and citations to "Compl. at ¶ X" are to the complaint in the New Jersey case filed by Quality Auto Painting Center of Roselle, Inc., which is, in relevant part, representative of the other four complaints.

37

inform insureds that particular shops: are not on their preferred provider lists; have had quality control issues; charge more than other shops; take longer than other shops; and do not perform work that can be guaranteed.

My concern with the body shops' complaints in this case—and with the majority's treatment of those complaints—is not that they have failed to adequately describe a pattern of behavior that, taken as true, might be considered objectionable. Indeed, as to one of the asserted causes of action—the tortious interference claim—I am persuaded that these actions, if proven, are unlawful. Rather, my concern is that conduct does not become unlawful by virtue of having been deemed objectionable. Nor does it become unlawful in one context by virtue of having been found so in another. Accordingly, when considering a motion to dismiss, courts must carefully apply the well-pled allegations to the requirements of each asserted claim. With regard to the antitrust claims, binding case law indicates to me that the allegations of these complaints do not give rise to the necessary reasonable inference of agreement or conspiracy and, therefore, fail to state a claim. I also conclude that the allegations fall short of stating claims with regard to quantum meruit and unjust enrichment. I discuss each in turn.

38

## IX.    Federal Antitrust Claims

The body shops have repeatedly[2] argued that the above-recited facts, if proven, violate federal antitrust law. Thus we are tasked with answering, as the Supreme Court has phrased it, "the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–55, 127 S. Ct. 1955, 1964 (2007). Section 1 of the Sherman Act, under which both the price fixing and boycotting claims are brought, provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. As that statutory language suggests, the Act "does not prohibit [all] unreasonable restraints of trade . . . but only [those] restraints effected by a contract, combination, or conspiracy." Twombly, 550 U.S. at 553, 127 S. Ct. at 1964 (first two alterations in original) (quoting Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 775, 104 S. Ct. 2731, 2743 (1984)). The crucial consideration then "is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement,

---

[2]    The instant appeal represents only a portion of more than twenty such cases filed on behalf of body shops around the country and consolidated in the Middle District of Florida. Notwithstanding this Court's disagreement with its resolution of the present issues, I agree with the majority in expressing my gratitude to the district court for its efficient and thorough handling of this extraordinarily complex litigation.

tacit or express.' " <u>Id.</u> at 553, 127 S. Ct. at 1964 (alteration in original) (quoting

<u>Theatre Enters., Inc. v. Paramount Film Distrib. Corp.</u>, 346 U.S. 537, 540, 74 S. Ct.

257, 259 (1954)). Accordingly, the answer to our antecedent question turns on

whether there is "a complaint with enough factual matter (taken as true) to suggest

that an agreement was made." <u>Id.</u> at 556, 127 S. Ct. at 1965.

In plausibly establishing the existence of such an agreement, "an allegation

of parallel conduct and a bare assertion of conspiracy will not suffice." <u>Id.</u> at 556,

127 S. Ct. at 1966. Indeed, long before <u>Twombly</u>:

> It [was] well settled in this circuit that evidence of conscious
> parallelism alone does not permit an inference of conspiracy unless
> the plaintiff either establishes that, assuming there is no conspiracy,
> each defendant engaging in the parallel action acted contrary to its
> economic self-interest, or offers other "plus factors" tending to
> establish that the defendants were . . . in a collusive agreement to fix
> prices or otherwise restrain trade.

<u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 570–71 (11th Cir. 1998)

(footnotes, citations, alterations, and quotations omitted). A showing of plus

factors is necessary because they "remove [a plaintiff's] evidence from the realm

of equipoise and render that evidence more probative of conspiracy than of

conscious parallelism." <u>Williamson Oil Co., Inc. v. Philip Morris USA</u>, 346 F.3d

1287, 1301 (11th Cir. 2003). Thus the body shops were required to plausibly allege

the existence of both (1) parallel conduct and (2) sufficient "plus factors" from which we could infer an agreement.[3]

The majority, in a conclusion to which I do not object, finds that the body shops have established the existence of the necessary parallel conduct. Based on this conduct, I—like the majority—searched the complaints for plus factors suggesting the existence of the proscribed collusive agreement. As it detailed above, the majority's search revealed two plus factors[4] that in its opinion support a plausible inference of an agreement to fix prices. Additionally, and although it declines to label them as such, the majority also apparently found sufficient plus factors to support an inference of an agreement to boycott. I am convinced that none of the identified factors—whether considered individually or together—will bear the weight attributed to them.

---

[3]    Of course, an antitrust plaintiff can also offer direct evidence of an agreement or evidence of parallel conduct that is contrary to the defendants' self-interest. The body shops have not done so here and are, accordingly, left with an attempt at adducing evidence of relevant plus factors.
[4]    The body shops argued on appeal that their complaints established at least five plus factors. The majority has relied only on those it identified in its opinion and, therefore, I do not address the body shops' additional plus factors in any depth. It bears mentioning, however, that I consider them to be wholly without merit.

## A. Price Fixing

Turning to the individual plus factors allegedly supporting horizontal price fixing,[5] the majority identifies two that it believes are suggestive of an agreement. Broadly speaking, the first concerns uniformity of price and the second concerns uniformity of action. I discuss each in turn.

### 1. Uniformity of Price

The majority first suggests that the insurance companies' conduct "probably does not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" because they have "adopt[ed] a uniform price despite variables that would ordinarily result in divergent prices." Maj. Op. at 15–16. As the majority's recitation suggests, this plus factor consists of two components. First, the defendants must have adopted a uniform price. This component, however, is suggestive only of parallel conduct and, without more, will not justify invoking the plus factor. Accordingly, the uniform price must exist "despite variables that would

---

[5]    In considering each plus factor, I am cognizant of the Supreme Court's admonition that antitrust plaintiffs receive "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S. Ct. 1404, 1410 (1962). At the same time, it is undoubtedly our responsibility "to evaluate the evidence proffered by the plaintiffs not to ascertain its credibility, but instead to determine whether that evidence, if credited, 'tends to' establish a conspiracy more than it indicates conscious parallelism." Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1301 (11th Cir. 2003).

ordinarily result in divergent pricing." The second component is the indicator of the agreement that makes collusion more likely than conscious parallelism.

The sources on which the majority relies in introducing this plus factor make clear the necessity of both components. Indeed, the majority observes that the Supreme Court has inferred an agreement where "for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers." Maj. Op. at 16 (quoting FTC v. Cement Inst., 333 U.S. 683, 713, 68 S. Ct. 793, 809 (1948)). But this is just the first component; the majority fails to point out that the record evidence in that case—discussed in the sentence immediately following the one that it quotes—established that "[t]housands of secret sealed bids ha[d] been received by public agencies which corresponded in prices of cement down to a fractional part of a penny." Cement Inst., 333 U.S. at 713, 68 S. Ct. at 809. Likewise, the majority quotes a leading antitrust treatise for the idea that an agreement may be present if rivals establish identical prices, but fails to grapple with the caveat that this is only true where there are "simultaneous identical bids on a made-to-order product not readily assembled from standard and conventionally priced items." Maj. Op. at 16 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434b (3d ed. 2012)). Thus, while this so-called convergent pricing certainly is—or at least could

43

be—a plus factor, it should only be invoked where we should otherwise expect divergent pricing. Considered in the appropriate light, the differences between the instant case and the sources on which the majority relies are substantial.

First, the focus on "secret," "sealed," and "simultaneous" bids is crucial precisely because it excludes the possibility of conscious parallelism: competitors cannot consciously parallel one another if they only learn of the other's price after they have established their own. Perhaps sensing this, the body shops' brief on appeal argues that "[a]ll of the [insurance companies] reach[] the same, identical 'market rate' . . . which State Farm refuses to [make] public." Brief of Appellants at 21. As an initial matter, alleging that State Farm does not publicly disclose the market rate and arguing that it is a secret are two very different things. The sources on which the majority relies do not focus on whether a certain party made the information public but, rather, simply on whether or not it was public. Stated differently, the fact that State Farm does not issue a press release with the market rate does not foreclose the possibility that it is publicly known. This is a crucial distinction.

However, giving the body shops the benefit of every inference in their favor as required in this posture, their argument in brief—that State Farm does not publish its market rate—could charitably be read to suggest that the market rate is

44

a secret. This would be a fairly damning allegation, and one that strikes right to

heart of Cement Institute's focus, if it were at all supported by the complaints.

Unfortunately, there are no factual allegations—to speak nothing of evidence—that

the market rate is a secret. Indeed, nowhere in the complaint do the body shops

suggest that the labor rate is a secret. Quite the opposite, the complaint reveals that

State Farm must necessarily tell the number to every repair shop in a given

geographic area.

Moreover—even if it were possible to share the market rate with the body

shops while, at the same time, keeping it a secret from the other insurance

companies—there are no allegations at all that the other insurance companies knew

what it was in advance. Indeed, rather than allege that all of the insurance

companies approached the body shops with an identical market rate (which might

possibly indicate that they had communicated in advance), the complaint alleges

twice that the other insurance companies simply conform to State Farm's rate—

whatever that may be. Compl. at ¶ 62 ("Defendants . . . specifically advised the

Plaintiff they will pay no more than State Farm pays for labor."); Compl. at ¶ 115

("[D]efendants [state] that they will conform to State Farm's payment structure.").

Following the example set by a competitor, without agreeing to do so in advance,

45

is textbook "price leadership"[6]—a practice we have repeatedly stated is insufficient to establish the existence of an agreement. See, e.g., Williamson Oil, 346 F.3d at 1301–03; City of Tuscaloosa, 158 F.3d at 571. Accordingly, even if State Farm's market rate were a secret—which, again, the body shops do not allege—such a fact would be of no use when the other insurance companies are not also alleged to have known the number in advance.

Further distinguishing our case from the examples on which the majority relies is the fact that auto body repairs are not the type of "made-to-order product not readily assembled from standard and conventionally priced items" where we expect to see divergent pricing. Maj. Op. at 16 (quoting Areeda ¶ 1434b). On the contrary, the "products" here—cars—are so readily assembled from standard parts that their assembly-line manufacturing set the standard for other industries. That the body shops are repairing those cars, rather than assembling them for the first time, does not make the parts used to do so any less standard. And they are so conventionally priced that, as discussed below, the body shops believe that the insurance companies should not be allowed to deviate from third-party databases

---

[6]    The majority (Maj. Op. at 22-23) fails to recognize that the allegation—that the insurance companies told the body shops that they would pay no more than State Farm—gives rise to no inference of prior agreement; to the contrary, it is a straightforward assertion of following the price leader.

46

that set standardized prices. Certainly, some parts—such as spark plugs, windshield wipers, brakes, and tires—may be standard across many makes and models of cars, while others—such as doors, windshields, headlights, and fenders—may only fit a few. But for the overwhelming majority of cars, the necessary parts are ubiquitous, interchangeable, and standardly priced. Thus, while convergent pricing where it should otherwise not be expected can undoubtedly serve as a plus factor, none of the indicators to which courts and commentators have traditionally looked to support such a factor—or at least none to which the body shops or the majority have pointed—are present here.

Neither the body shops nor the majority have pointed to any plausible reason that one should expect that prices in this market—involving standardized automobile parts and repairs—would be divergent.  Quite the contrary, the body shops argue that the insurance companies should comply with several databases that exist for the sole purpose of establishing standardized pricing.  That is, the fact that the body shops insist that the insurance companies should comply with the prices published in these three separate databases assumes that such prices are standardized, and that one should expect convergent prices—not divergent prices.

In short, the instant case bears none of the traditional hallmarks of a situation in which uniform pricing is present in an industry where we would otherwise not

47

expect it. Nor are any of the other reasons offered by the body shops (or the majority) suggestive of an environment in which we would expect to see divergent pricing. The majority's reliance on this plus factor is premised on an assumption that there has been an "adoption of a uniform price despite variables that would ordinarily lead to divergent prices;" yet I see no indication that I should expect to see divergent pricing in this industry. And without an expectation of divergent pricing all that remains is an allegation of uniform pricing, which is indicative only of parallel conduct. Accordingly, I would reject this plus factor as an indicator of the necessary agreement.

### 2.  *Uniformity of Tactics*

As to its second plus factor, the majority concludes that the insurance companies have engaged inuniform practices suggestive of an agreement. Maj. Op. at 17-18. True enough, several courts have found a plus factor where there is a similarity of language, terms, or conditions used by the alleged co-conspirators that would be improbable absent collusion. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 256–58 (2d Cir. 1987); De Jong Packing Co. v. U.S. Dep't of Agric., 618 F.2d 1329, 1332–34 (9th Cir. 1980). And, true enough, the body shops' appellate briefing describes the insurance companies' tactics as "the same," "identical," and part of a "script[]." Brief of Appellants at 22. Thus, if I were required to accept the

48

well-pled allegations of a brief as true I might be inclined to agree with the majority.

Unfortunately, the body shops' appellate briefing is once again betrayed by their complaints, which introduce the relevant tactics as follows:

> Through various methods, the [insurance companies] have, independently and in concert, instituted numerous methods of coercing the [body shops] into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

Compl. at ¶ 63. Whatever else can be said about that allegation, I see no reason to conclude—as the majority obviously does—that the body shops even believe the tactics were highly uniform.[7] Indeed, the complaint reflects nothing approaching the level of conviction about the body shops' allegations that the majority reads into it.

Nonetheless, the majority concludes that the insurance companies have engaged in uniform tactics because they have all required the body shops "to repair a faulty part rather than install a replacement part; to install a used or recycled part; and to offer discounts and concessions." Maj. Op. at 18. Even if these tactics were

---

[7]     As for what else can be said about that allegation, the fact that the body shops concede that some of the alleged actions occurred "independently" is certainly noteworthy. How the majority was able to discern which of the allegedly nefarious activities were conducted "in concert"—a Sherman Act concern—and which were conducted "individually"—a decidedly non-Sherman Act concern—is left unspoken.

highly uniform, they are suggestive of an agreement only when those tactics would not plausibly arise from "independent responses to common stimuli." See Twombly, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n.4 (quoting Areeda ¶ 1425). Yet, the majority fails to address the fact that all three of these "highly uniform" tactics are easily explained by the most common of corporate stimuli: a desire to increase profits. And while some methods of increasing profits could be so idiosyncratic as to be unlikely to arise in the absence of an agreement, such is plainly not the case here. None of these tactics could even be fairly described as novel, let alone as sufficiently idiosyncratic to support an inference of an agreement. It can hardly be denied that repairing (rather than replacing) damaged parts, installing recycled (rather than new) parts, and requiring discounts are among the most common and time-worn methods of increasing corporate profits in any industry, let alone in an industry where parts and labor reimbursements are the primary business expenditures. Cf. Maj. Op. at 14 (setting forth an established legal principle, which I respectfully submit the majority then fails to apply: "But plaintiffs' plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market." (quoting In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1189 (9th Cir. 2015)). And yet, under the standard

50

announced today, the mere existence of an industry-wide practice permits an antitrust plaintiff to establish a plus factor.

I do not believe that a complaint merely alleging several common (and obvious) industry practices should proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery. The Supreme Court has described precisely this problem:

> [E]ven if [defendants committed all the acts] in all the ways the plaintiffs allege, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

Twombly, 550 U.S. at 566, 127 S. Ct. at 1971 (citation omitted).

In short, the majority's analysis of its second plus factor suggests that the insurance companies' tactics are highly uniform when even the complaint does not seem to believe that; declines to explain how it divined which of the challenged activities occurred "in concert" and which occurred "independently;" and relies upon several alleged tactics which are clearly common, obvious, and mainstream. In contrast to the majority, I do not believe an inference of prior agreement arises from the mere fact that several insurance companies adopt policies favoring use of cheaper parts and offering discounts to insurance companies. I respectfully submit

51

that the majority's analysis is inconsistent with Supreme Court and Eleventh Circuit precedent. Accordingly, as with the first, I would reject the second plus factor and affirm the dismissal of the price fixing claim.

## B. Boycotting

Despite my substantial doubts about the existence of a price fixing agreement, the allegations suggesting an agreement to boycott are even weaker. At least in their price fixing allegations the body shops made passing reference to an agreement. Not so with respect to a boycott agreement. While I do not consider it dispositive, it is certainly noteworthy that the body shops never allege—even in a conclusory fashion—an agreement to steer customers away from, or to boycott, the body shops.[8] Neither the "steering" allegations nor the "boycott" section of the complaint allege the existence of an agreement to do so. And even if we incorporate the allegations of an agreement from the price fixing sections of the complaint, I respectfully submit that the instant complaint would still fall short of even the "few stray statements [that] speak directly of agreement" which the Supreme Court has held are insufficient. Twombly, 550 U.S. at 564, 127 S. Ct. at 1970.

---

[8]    Although I do not consider this failure to be dispositive, treating it as such would not be outlandish. At a bare minimum, we should expect antitrust plaintiffs to state their belief that an agreement was reached before we go off in search of plus factors to support an inference of its existence.

52

Undisturbed by the fact that the body shops do not even profess a belief in the existence of an agreement to boycott, the majority concludes a brief reversal of the boycotting claim with the following analysis:

> Accepted as true, the body shops' allegations readily and plausibly establish the per se violation of boycotting. The body shops allege that the insurance companies targeted non-compliant shops by  keeping insureds away until those shops charged at or less than the market rate. And the body shops allege that, in accordance with the agreement, the insurance companies used identical tactics to keep insureds away.

Maj. Op. at 25 (alteration in original). Thus the majority offers two allegations—it declines to call them plus factors—which it apparently believes support the existence of an agreement to boycott: steering and the use of identical tactics in that steering.

As an initial matter, an allegation of steering—standing alone—cannot be indicative of an agreement. Steering is a decidedly unilateral activity; it involves one insurance company steering one of its customers away from one of the body shops. Accordingly, even if all of the insurance companies engage in it, steering itself suggests only parallel conduct. Of course, as the tortious interference claims suggest, it is potentially illegal parallel conduct. But it is only parallel conduct all the same.

53

That said, if there were allegations that "the insurance companies used identical tactics to steer insureds away," as the majority claims, the needle would move toward an inference of the existence of an agreement if, but only if, such similar or identical tactics would not plausibly arise from "independent responses to common stimuli."  Twombly, 550 U.S. at 556 n.4, 127 S. Ct. at 1965 n.4. But once more, the body shops have asserted in their appellate briefing—and the majority has sanctioned—facts that are simply unsupportable on this record. Indeed, although the body shops have argued on appeal that "[a]ll of the Defendants utilize the same script containing identical false and misleading steering statements," Brief of Appellants at 30, neither they nor the majority opinion suggest where I can find such an allegation. Both the word "script"—as used by the body shops—and the word "identical"—as used by the majority—are conspicuously absent from the complaints.

Almost as troubling as what the body shops have not pled and yet are given credit for is what they have pled and yet are not held to account for. With regard to steering, the body shops allege that:

> Examples of this practice include telling insureds and/or claimants that a particular chosen shop is not on the preferred provider list, that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at

54

the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.

Compl. at ¶ 83. From this, it is argued—and I am asked to conclude—that the body shops have engaged in "identical" tactics. But even a basic illustration of the pleading trick at work here reveals a fatal flaw. Assume that State Farms steers a consumer using excuse X; 21st Century steers a consumer using excuse Y; and GEICO steers a consumer using excuse Z. The body shops can (truthfully) make the following allegation: "The insurance companies engage in steering. Examples of these tactics include X, Y, and Z."[9] In reality, tactics X, Y, and Z are in no way identical. And yet—using this exact pleading formula—the majority here would infer that the companies use identical tactics and allow a claim to lie for antitrust boycotting. Put another way, the body shops' allegations—and the conclusion the majority draws from them—is akin to saying: (1) that a group of people "travel" to get to work; (2) that "examples of this 'travel' include driving cars, riding bikes,

---

[9]    It is worth noting in my example—as in the instant case—the body shops have not alleged that the complained-of tactics are "identical."

55

boarding trains, and walking on sidewalks;" and (3) that these people, therefore, use "identical tactics" to get to work. This simply cannot be the case.[10]

Put simply, the majority relies upon two asserted plus factors: one (steering) is at best indicative of parallel conduct and the other (identical tactics) has no basis in the complaint. Moreover, even if the insurance companies were alleged to have used the same or similar reasons why their insureds should not use a particular body shop, established case law would still require a court to then address whether such similarity would be improbable absent collusion or, rather, whether it was equally plausible as independent responses to common stimuli.[11] For the forgoing reasons, I conclude that the complaints fall short of alleging facts giving rise to an inference of an agreement or conspiracy to boycott the body shops.

## C. Conclusion

As the Supreme Court has observed, "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded

---

[10]    The body shops use, and the majority endorses, a similar pleading trick with respect to the "non-exhaustive list of procedures and processes the [d]efendants refuse to pay and/or pay in full." Maj. Op. at 8 n.5 (alteration in original).

[11]    Even if the insurance companies were alleged to have used similar or identical reasons as to why their insureds should not use a particular body shop, the reasons suggested—that the body shop charges more or takes longer or does poor quality work—would seem to be obvious reasons an insurance company would not want its insureds to use that body shop.  That is, such similarity would seem to be independent responses to common stimuli.

hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim." Twombly, 550 U.S. at 559, 127 S. Ct. at 1967 (alteration in original) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634 (2005)). The care required is, at a minimum, enough to ensure that the facts which are used to justify invoking a plus factor are actually alleged, and that the plus factors demonstrate parallel behavior plus something else sufficient to give rise to a plausible inference of the existence of an agreement or conspiracy. Because the body shops' complaints reveal significant shortcomings on both of these basic requirements, I would affirm the district court's dismissal of both federal antitrust claims.[12] Accordingly, I respectfully dissent from the majority's decision with regard to the antitrust claims.

## X.    State Tort Claims

The district court also dismissed, as relevant here, three state law claims brought by the body shops. As does the majority, I would reverse the dismissal of the body shops' tortious interference claims. Unlike the majority, however, I would affirm the dismissal of both the unjust enrichment and quantum meruit claims because neither is justified by the allegations of the complaint.

---

[12]    See infra note 28 (suggesting my concern that the majority may have implicitly relied on the insurance companies' market power, leading it to dilute the requirement that there must be—in addition to consciously parallel conduct—a plus factor giving rise to a plausible inference of an agreement or conspiracy).

57

### A. Unjust Enrichment

I respectfully dissent from the majority's decision to reverse the district court's decision dismissing the body shops' unjust enrichment claims. In all of the complaints there is an allegation to the effect that each insurance company specifically advised each body shop that they would pay no more than State Farm pays. Compl. at ¶ 62 ("Defendants . . . specifically advised the Plaintiff they will pay no more than State Farm pays for labor."). Thus it is clear that the body shops knew before undertaking the repair that they were to be paid certain amounts or in certain ways. The body shops then undertook the repair anyway. Accordingly, it is simply not unjust for the insurance companies to retain whatever "benefit" (if any) that they might be deemed to have received.

Under the laws of the four states relevant here—Kentucky, Missouri, New Jersey, and Virginia—one of the elements of an unjust enrichment claim is that it would be unjust or inequitable for the defendant to retain the benefit allegedly conferred upon it.[13] Because each complaint at issue here specifically alleges that

---

[13]    See Jones v. Sparks, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) ("For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."); Binkley v. Am. Equity Mortg., Inc., 447 S.W.3d 194, 199 (Mo. 2014) ("An unjust enrichment claim requires a showing that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." (quotation omitted)); VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526 (N.J.

58

each insurance company advised the body shops that it would pay no more than State Farm pays, it clearly was not unjust for each insurance company to pay only that amount and no more.

Moreover, there is an indisputable principle of law set forth in the Restatement (Third) that where the parties have an opportunity to arrive at a contract and do not do so, the courts will generally not go behind them and establish a valuation for their transaction. See Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. d (2011) ("Instead of proposing a bargain, the restitution claimant first confers a benefit, then seeks payment for its value. When this manner of proceeding is unacceptable—as it usually is, if the claimant neglects an opportunity to contract—a claim based on unjust enrichment will be denied." (emphasis added)). As the district court correctly held, the body shops' unjust enrichment claims fail because they had an opportunity to bargain for a deal they

1994) ("To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust."); Schmidt v. Household Fin. Corp., II, 661 S.E.2d 834, 838 (Va. 2008) ("To state a cause of action for unjust enrichment, [a plaintiff has] to allege that: (1) he conferred a benefit on [the defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value."). Although the Virginia rule statement does not expressly require that retention of the benefit be unjust, such a requirement is routinely read into the elements by Virginia courts. See, e.g., R.M. Harrison Mech. Corp. v. Decker Indus., Inc., 75 Va. Cir. 404, 2008 WL 10669311, at *3 (2008) ("The circumstances of the acceptance or retention of the benefit must render it inequitable for the defendant not to compensate the plaintiff.").

considered to be fair and failed to do so.[14] Forgoing their opportunity to bargain, and notwithstanding the fact that the insurance companies had specifically advised that they would pay no more than State Farm pays, the body shops nevertheless undertook the repairs and are now seeking to require the insurance companies to pay more than State Farm had said it would pay. In my judgment, the unjust enrichment claims of the body shops are not only without merit, they border on being frivolous claims. I would affirm the judgment of the district court with regard to the unjust enrichment claims, and I respectfully dissent from the majority's decision to reverse.

I also briefly set forth two additional concerns with regard to the majority's analysis of the unjust enrichment claims. First, in service of a conclusion that the insurance companies' actions were somehow unjust, the majority stretches the words "forced" and "involuntarily" until they cover basic participation in a free market economy. Second, the majority implicitly resolves an open question of state law without any analysis at all.  Both are problematic.

---

[14]    The body shops have consistently argued that they did not have an opportunity to bargain because the insurance companies offered the market rate on a "take it or leave it" basis and that the insurance companies refused to negotiate. If this is all that is necessary to circumvent the rule that parties who are able to negotiate should be held to do so, the rule will quickly become extinct.

My first concern with the majority's analysis is its determination that it would be unjust for the insurance companies to retain any benefit based on the explanation that "the body shops consistently allege that the insurance companies <u>forced</u> the shops to confer benefits; that the shops <u>involuntarily</u> performed repairs at the low market rate." Maj. Op. at 28 (first emphasis added). While it is not possible here to raise all of the secondary consequences of the majority's conclusion that the body shops were "forced" into "involuntarily" performing repairs, I find it worthwhile to highlight just a few of my more serious concerns.

As an initial matter, the majority's analysis calls into question the principle, discussed above, that parties who have an opportunity to contract in advance should do so and, if they do not, the courts should generally refrain from establishing a value in quasi-contract after the fact. <u>Accord</u> Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. d (2011) (quoted above). As the Seventh Circuit has recognized, "[b]etter that the [plaintiff] should negotiate with the defendant rather than thrusting on the court the difficult task of constructing a hypothetical bargain." <u>Nadalin v. Auto. Recovery Bureau, Inc.</u>, 169 F.3d 1084, 1086 (7th Cir. 1999). The majority turns this traditional conception on its head and places those who forgo a contract in a <u>better</u> legal position than those who contract in advance. This is evident from that fact that the body shops in the instant

61

appeal—who did not negotiate a DRP agreement—are permitted to bring otherwise unavailable state law claims while those shops who (as the law encourages) contracted in advance through a DRP are limited to suing on their contracts. As the majority notes, none of the body shops in the instant appeal are a part of a DRP. This is not an accident. The body shops are well aware that if they are signatories to a DRP agreement, their remedy lies in contract rather than in the unjust enrichment actions they bring here.

Nonetheless, the majority apparently concludes that the body shops' failure to strike an acceptable bargain for their services prior to performing the repairs is excusable because the insurance companies allegedly "forced" them to "involuntarily" perform the repairs at State Farm's market rate. I respectfully submit that the majority has—in its attempt bring the body shops' allegations within the scope of unjust enrichment—expanded the definition of those two words beyond their accepted meaning. The majority's use of the term "forced" in the instant context is inconsistent with the facts actually pled by the body shops. The body shops were under no obligation, legal or otherwise. They were not threatened or tricked. They were not coerced.[15] They simply made themselves available to

---

[15]    I submit that the body shops' allegation of force should be disregarded as a conclusory allegation.  No concrete facts have been alleged from which might arise a reasonable inference of force.

perform a service for compensation, the amount of which they were advised before undertaking the repair. They are now dissatisfied with that amount of compensation and are suing for more. Like any other service provider, they have— or at least had—three options: (1) perform their service for the price that someone else was willing to pay; (2) negotiate for a higher fee; or (3) decline to perform the service. Every company in America recognizes that finding the proper mix of those three basic choices is a crucial part of achieving—or maximizing—profitability. What the body shops now seek is a fourth option: run to the federal courts and complain of being "forced" into performing their service.[16]

It is no exaggeration to say that the majority's apparent holding threatens some basic tenets of our economic system. As just one example, consider a homeowner who makes known that she will pay $10,000 to have her house painted, claiming (truthfully or not) that this is the going rate. A painter, believing that the actual market rate (again, truthfully or not) is $15,000, paints the house and the owner writes him a check for $10,000. If the failure to contract is no longer a

---

[16]    For that matter, I see no reason why the majority's logic cannot just as readily be employed as a weapon by consumers against the body shops. Suppose a consumer's car is badly damaged and cannot be driven. Not wanting his insurance rates to increase, he decides to pay for the repairs out of pocket. If one of the body shops charges him an amount in excess of what he thinks he should pay, has he been "forced" to pay that amount? Is it "involuntary"? Is he permitted to sue the body shop and have a court determine the reasonable price of the repair? Is this really what federal courts should be doing? These questions, and many more, are left unanswered in the majority's opinion.

barrier in this Circuit—as would seem to be the case under the majority

opinion[17]—the painter then sues for unjust enrichment of $5,000 on the theory that

the market rate established by the owner was too low. Has she "forced [him] to

confer benefits?" Has he "<u>involuntarily</u> performed [the painting] at the low market

rate?" Has she been unjustly enriched?  Surely these questions must be

resoundingly answered in the negative. And if that must be so, there is no

principled reason why the answer to our present question should be any different.

Nor does this example become any more unjust by virtue of a shift in the

parties' relative bargaining power.[18]  Suppose that, rather than a singular

homeowner, a real estate developer desires to have an entire subdivision of homes

painted at a rate of $9,000 each. This amount consists of the $10,000 "market rate"

and a 10% "volume discount." The painter is faced with the same options as our

body shops: conform to the rate and accept the discount, negotiate with the

---

[17]    Notably, both parties in this example agree that the painter is entitled to some amount ($10,000) just as both parties in our instant case agree that body shops are entitled to some amount (the State Farm "market rate"). The failure to contract then in both cases is for an amount <u>beyond</u> what was agreed to.

[18]    The majority suggests that a mere disparity in bargaining power can invalidate a contract. Maj. Op. at 29.  However, the majority cites no case law or other authority to support the novel proposition that mere bargaining power or mere market power is sufficient to invalidate a contract.  Moreover, the body shops have not even argued on appeal that a disparity in bargaining power could invalidate a contract, or that it could render unjust the insurance companies' retention of the benefits conferred.  Thus, any such argument, not being fairly raised on appeal, is abandoned.  See, e.g., <u>Sapuppo v. Allstate Floridian Ins. Co.</u>, 739 F.3d 678, 681-83 (11th Cir. 2014).

developer, or forgo the business. The fact that this is a large chunk of the painter's business notwithstanding, it cannot be seriously argued that he is being forced to paint the houses. Nonetheless the painter—if the majority's opinion and its logical consequences are to be taken at face value—can now undertake the job, collect the discounted rate ($9,000 per house), and then sue the company for the remaining amount it feels it is owed.[19] I am troubled by this possibility.

My second concern is the majority's implicit decision on an open question of state law.  Both on appeal and in the district court, the insurance companies argued that, because the body shops repaired cars belonging to the insureds, any benefits were rendered to them and not to the insurance companies. This argument was sufficiently persuasive that the district court had previously dismissed another action in this litigation because, under Florida law, the benefits were conferred not on the defendant insurance companies but rather on their insureds.[20]  However, in the instant case, the district court recognized that outside of Florida the courts are divided on the issue of whether, in the insurance context, the benefit is bestowed

---

[19]    This is, of course, on top of the fact that if a couple of other developers all independently decide to pay no more than our hypothetical price leader, the entire group can now be hit with antitrust violations if the majority opinion and its logical consequences are to be the law of this Circuit.

[20]    See A&E Auto Body, Inc. v. 21st Century Centennial Ins. Co., 2015 WL 12867010, at *5 (M.D. Fla. Jan. 22, 2015) ("[I]n unjust enrichment case, . . . 'a third party providing services to an insured confers nothing on the insurer except a ripe claim for reimbursement.'" (quoting Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co., 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004))).

on the insured or the insurance company. For that reason, the district court dismissed the instant unjust enrichment claims on alternative grounds.[21] Although it was not a basis for the decision below, this question—on whom the benefit was conferred—was discussed in the magistrate's report and recommendation, in the district court's order, and in the appellate briefing.

Implicitly deciding this open issue of state law, the majority simply holds, twice, that the body shops stated a valid claim for unjust enrichment. Maj. Op. at 27 ("The allegations readily and plausibly establish the claims of unjust enrichment."); Maj. Op. at 33 ("[T]he allegations have sufficiently established the body shops' state tort claims of unjust enrichment . . . ."). In doing so, the majority has necessarily decided that all of the elements have been satisfied. Thus the majority has implicitly decided that, under the laws of all four states, the benefit is to be deemed conferred on the insurance company, not the insured.

The majority's implicit decision might be understood if the case law so clearly supported one side or the other as to not be worthy of lengthy discussion. Unfortunately, the opposite is true. In many states—including, as far as I can tell, each of the four that are relevant here—the proper resolution of this issue remains

---

[21]    These alternative grounds largely mirror the basis on which I would affirm the district court's decision to dismiss the unjust enrichment claims—namely that the retention of a benefit (if any) would not be unjust where the body shops knew how much the insurance companies would pay before undertaking the repair and where they also forwent an opportunity to bargain.

an open question.[22] And, in addition to its being an open question in the relevant states, the states that have decided the question differ widely in their approach.[23]

In implicitly deciding this issue, the majority opinion has the effect of foreclosing the insurance companies from raising the argument on remand. Even if the majority must reverse the district court and hold that the body shops have adequately pled that the insurance companies' retention of benefits was unjust, I respectfully submit that the majority should have remanded this issue of first impression to the district court to resolve in the first instance on remand.

For the reasons discussed above, I would affirm the judgment of the district court with respect to the unjust enrichment claims, and I respectfully dissent from the majority's decision in this regard.

### B. Quantum Meruit

I must also register my dissent from the majority's decision to reverse the district court's dismissal of the quantum meruit claims arising under the state laws

---

[22]    New Jersey has found a benefit to a prison where a private hospital treated an inmate on its behalf. Saint Barnabas Med. Ctr. v. Essex County, 543 A.2d 34 (N.J. 1988). While certainly analogous, that case is factually distinguishable based, among other things, on the legal duty a jailer owes to inmates. A federal district court in Kentucky has addressed a similar question in the health insurance context. See Appalachian Reg'l Healthcare v. Coventry Health & Life Ins. Co., 2013 WL 1314154 (E.D. Ky. Mar. 28, 2013). Any conclusions that are drawn therein are obviously not binding on us or the Kentucky state courts. I have not seen any indication that the Virginia or Missouri courts have addressed this question.

[23]    Compare Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868 (S.C. 2000), with Emergency Physicians Integrated Care v. Salt Lake County, 167 P.3d 1080 (Utah 2007).

of Kentucky, New Jersey, and Virginia.[24] I would have affirmed the judgment of the district court because, under the laws of the three states relevant here, the body shops were required to allege, among other elements, that the circumstances reasonably notified the insurance companies that they expected to get paid (Virginia and Kentucky) or that they reasonably expected to be compensated (New Jersey).[25] They cannot do so here.

As I have discussed above, the body shops specifically alleged that each of the insurance companies informed them that they would pay no more than State Farm. The body shops then undertook the repairs. Having fully informed the body shops of what they were willing to pay, the circumstances could have only reasonably informed the insurance companies that the body shops expected to be paid the market rate. This is fatal to the Virginia and Kentucky claims. Likewise, having been fully informed that the insurance companies would only pay the market rate, the body shops could not have reasonably expected to receive more than that amount. This is fatal to the New Jersey claim.

Respectfully, I think that the majority's analysis contains two flaws that have resulted in our differing views on the resolution of this issue. The first is the

---

[24]    The Missouri complaint does not include a cause of action for quantum meruit.
[25]    See Raymond, Colesar, Glaspy & Huss, P. C. v. Allied Capital Corp., 961 F.2d 489, 491 (4th Cir. 1992); JP White, LLC v. Poe Cos., LLC, 2011 WL 1706751, at *5 (Ky. Ct. App. May 6, 2011); Weichert Co. Realtors v. Ryan, 608 A.2d 280, 285 (N.J. 1992).

majority's conclusion that, because the body shops had a reasonable expectation of some compensation, they need not demonstrate a reasonable expectation as to the amount they are now requesting. Maj. Op. at 30 ("The body shops allege that they rendered repair services, expecting compensation . . . and that the companies paid an artificial price, below the reasonable value for the services."). Undoubtedly, the body shops could reasonably have expected some compensation. Equally undoubtedly, they could not—at least not reasonably—have expected to receive more than the market rate when, by their own pleadings, every insurance company informed them that they intended to pay no more than that rate. Unconcerned with this distinction, the majority apparently concludes that because they expected some compensation, they are entitled to have a court determine not just what they could reasonably have expected, but—regardless of their expectations—the reasonable value of the services they provided.

The body shops have not cited, and independent research has not uncovered, any controlling authority in the three relevant states to such an effect. Thus, without any explanation as to why, the majority appears to have decided an open question of state law on a state cause of action. As I have mentioned previously, deciding open state law questions with no explanation might be understandable if other authority overwhelmingly pointed in a single direction. Such is not the case.

69

The only analogous case law suggests the exact opposite result of that reached by the majority: when a plaintiff has a reasonable expectation of some amount, they cannot reasonably expect to receive additional compensation and therefore cannot bring suit to recover it.[26]

It is not at all surprising to me that the courts to consider this issue have resolved it differently than the majority given that it is indistinguishable from the house painting example in the previous section. True enough, the painter could have expected some compensation ($10,000) for performing a service (painting the house). But—having already received what he could have reasonably expected in compensation—surely he is not now entitled to file a lawsuit for quantum meruit, allege that the reasonable value of his services is $15,000, and have a court determine what should be paid him. And yet as surely as such a conclusion is implausible, it would logically follow from today's decision. It simply cannot be the law that a plaintiff, knowing full and well that it has no reasonable expectation of receiving what it considers the fair market value of its services, can nonetheless perform a service and then survive a motion to dismiss in its subsequent suit to

---

[26]    See, e.g., Hindsight Sols., LLC v. Citigroup Inc., 53 F. Supp. 3d 747, 776 (S.D.N.Y. 2014) (unjust enrichment claim failed because plaintiff could not have reasonably expected to receive additional compensation); Rodriguez v. Ready Pac Produce, 2014 WL 1875261, at *3 (D.N.J. May 9, 2014) (dismissing unjust enrichment claim where plaintiff "would have no reasonable expectation to receive additional compensation for hours worked in excess of a particular amount per week").

70

recover that "full" value. This is unworkable for the business community and unsustainable for the judicial community.

My second concern is that the majority, again in the quantum meruit context, has implicitly decided the same open question of state law referred to above in my discussion of unjust enrichment. Again, the majority has implicitly decided that, under the laws of the three relevant states, the quantum meruit law contemplates in the insurance context that the car repairs constitute a service to the insurance company rather than (or in addition to) the insured. However, as in the unjust enrichment context, this is an open question of state law that was not addressed by the district court and has decisively split the jurisdictions to confront it. In so doing, the majority tackles a substantial and unresolved question of state law, without any analysis. I respectfully submit that the more appropriate resolution for the majority would have been to remand the issue to the district court for resolution in the first instance.

For the reasons stated in the first two paragraphs of this section, it is clear to me that the allegations of these complaints fall far short of stating any claim for quantum meruit. Accordingly, I would affirm the judgment of the district court in this regard. I respectfully dissent from the majority's decision with respect to the quantum meruit claims.

71

## C. Tortious Interference

Lastly, although I agree with the majority that the dismissal of the tortious interference claims was in error and is due to be reversed, I disagree with the reasoning employed by the majority in reaching that decision. As an initial matter, I would have reversed the district court's decision to dismiss the tortious interference claims for allegedly impermissible group pleading. The concerns raised by the district court stem not from the fact that the insurance companies are unable to ascertain which aspects of the alleged conduct apply to them but, rather, from the fact that it was not clear to the district court how that conduct amounts to a viable claim. This is a pleading problem to be sure, but it is not a group pleading problem. Accordingly, the dismissal was due to be reversed on that basis alone.

I would also have found that the body shops adequately stated a claim under the laws of each of the four states. Although the elements of the claim are not identical, there are three requirements of tortious interference that are both common to all four of the relevant states and which could reasonably be contested by the parties: (1) the body shops must have had a valid business expectancy; (2) the insurance companies must have had knowledge of that valid business

72

expectancy; and (3) any interference must have been improper.[27] All are satisfied by the steering allegations. The first requirement is met because the body shops allege that the insureds had chosen a particular body shop, Compl. at ¶ 83 ("Examples of this practice include telling insureds and/or claimants that a particular chosen shop is not on the preferred provider list . . . ." (emphasis added)), thereby raising the shop's prospective economic interest above a purely speculative level. Secondly, the steering allegations also make clear that the insurance companies had knowledge of the prospective economic advantage—if they did not know that an insured had chosen a shop they would not have been able to steer them away from it. Lastly, the allegations of the complaint suggest, among

_____

[27]    See Snow Pallet, Inc. v. Monticello Banking Co., 367 S.W.3d 1, 6 (Ky. Ct. App. 2012) ("[Plaintiff] must prove: (1) the existence of a valid business relationship or expectancy; (2) that [defendant] was aware of this relationship or expectancy; (3) that [defendant] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages."); Clinch v. Heartland Health, 187 S.W.3d 10, 14 (Mo. Ct. App. 2006) ("The elements of tortious interference with a business relationship are: (1) The plaintiff was involved in a valid business relationship; (2) the defendant was aware of the relationship; (3) the defendant intentionally interfered with the relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of defendant's conduct."); Lamorte Burns & Co., Inc. v. Walters, 770 A.2d 1158, 1170 (N.J. 2001) ("To prove its claim, plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby."); Dunlap v. Cottman Transmission Sys., LLC, 754 S.E.2d 313, 318 (Va. 2014) ("The necessary elements to establish a prima facie case are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. . . . [A] plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference, but also that the defendant employed improper methods." (alterations and quotations omitted)).

other things, that steering is done to "punish" noncompliant shops, that it is accomplished through "misrepresentation of facts," and that it is "malicious." Compl. at ¶¶ 36, 82, & 107. Taken as true, such behavior is sufficiently improper to survive a motion to dismiss. Accordingly, in addition to reversing the district court's group pleading analysis, I would also have remanded with a determination that the complaints state a valid claim for tortious interference.

Although I agree with its outcome, I have two significant concerns with the majority's analysis of the claims that prevent me from concurring in the opinion. My first concern with the majority's analysis of the tortious interference claims is that it makes explicit a sentiment that I fear may have implicitly influenced the majority's disposition of other claims: namely that "the market dominance of the defendant companies and the percentage of revenue that the defendant companies generated for a body shop . . . establish the companies' command over a body shop in each state." Maj. Op. at 31-32. However, whether or not the insurance companies, collectively, have a large market share is plainly not relevant to an inquiry into whether an insurance company tortiously interfered with a customer of a particular body shop. I have previously outlined the three elements of a tortious interference claim that both are common to all four relevant states and are also contested here. Market power is plainly irrelevant to both the first—the existence

74

of a valid business expectancy—and the second—the insurance companies'

knowledge of that business expectancy. And as to the third element—

improper intentional interference—neither the body shops nor the majority cite any

authority suggesting that mere market power can transform otherwise appropriate

conduct into improper interference for purposes of a tortious interference claim.

Accordingly, I respectfully submit that the majority's reliance on the market power

of the insurance companies is inappropriate.[28]

Lastly, I write to express my concern with the majority's brief analysis of

group pleading, a doctrine that has plagued this case from the beginning.

Specifically, the majority notes that the district court concluded that "at a

minimum, Plaintiffs should allege sufficient facts specific to each Defendant, or at

---

[28]    The majority's explicit reliance on market power in the contexts of both tortious interference and unjust enrichment (see supra, note 18), and the prominence of the majority's recitation in its Part II.A of the facts relating to market dominance, lead me to fear that the majority may have implicitly relied on market power in its resolution of other claims. In the price-fixing context for example, I fear that this concern may have lured the majority into holding that market power, coupled only with consciously parallel conduct, is sufficient to warrant an inference of agreement or conspiracy to fix prices notwithstanding the absence of any plausible factual allegations giving rise to such inference, and notwithstanding that the actual facts indicate that convergent pricing (especially in light of the price leadership) would be the expected course of events. If the majority is implicitly holding that market power—coupled only with consciously parallel conduct in the form of price leadership—is a sufficient plus factor to warrant an inference of agreement or conspiracy for antitrust purposes, I respectfully submit that such a complex and novel holding should be explored only after thorough briefing and full analysis. In any event, I would disagree with any such holding for at least two reasons: first, that argument has not been fairly raised in the body shops' appellate briefing, and therefore has been abandoned, see, e.g., Sapuppo v. Allstate Floridian Ins. Co, 739 F.3d 678, 681–83 (11th Cir. 2014) ("A party fails to adequately 'brief' a claim when he does not 'plainly and prominently' raise it . . . ."); and second, even if market power could in an appropriate case be considered to have any relevance in the "plus factor" analysis—an issue which I need not address—it would not warrant an inference of agreement or conspiracy in the instant case where convergent pricing is so clearly to be expected.

least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged." Maj. Op. at 32. It then rejects this premise because "[i]t is unclear why such allegations are necessary." Maj. Op. at32. I do not find it at all unclear. They are necessary because the purpose of Rule 8 pleading is to provide a "defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." Twombly, 550 U.S. at 55, 127 S. Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)). And whatever else such "fair notice" requires, I think, as the district court clearly did, that "at a minimum, [it requires that] Plaintiffs should allege sufficient facts specific to each Defendant, or at least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged." It is, to put it plainly, necessary because a defendant cannot be fairly asked to defend a claim if the alleged facts do not tie that defendant to the wrongdoing.

The problem with the district court's group pleading analysis in this case is not—as the majority believes—that it unnecessarily required the body shops to tie the insurance companies to the alleged wrongdoing. The problem with the district court's analysis—and the reason that I join the majority in reversing with respect to this claim—is that the body shops have in fact done so. Each corporate defendant could read the complaint and fairly discern what it is they are alleged to have done. This—at least in this context—is all that Rule 8 requires and, accordingly, it was

76

error to dismiss the complaints for group pleading. But to suggest that such pleadings are not "necessary" is plainly not true.

Accordingly, although I agree with the majority's decision to ultimately reverse the dismissal of the tortious interference claims for the reasons I detailed in the opening paragraphs of this section, because of the concerns that I raise about the majority's reasoning for doing so, I concur only in the judgment.

## XI.    Conclusion

With regard to the majority's reversal of the district court order dismissing the tortious interference claims, I concur in the result only. With regard to the remainder of the majority's opinion, I respectfully dissent.